302 September 22, 2016 No. 59

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

ROBERT DARNELL BOYD,
*Petitioner on Review.*

(CC 201026332; CA A151157; SC S063260)

On review from the Court of Appeals.*

Argued and submitted January 12, 2016.

Laura A. Frikert, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Rebecca M. Auten, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, and Brewer, Justices, and Garrett, Justice *pro tempore*.**

LANDAU, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

_____

* Appeal from Lane County Circuit Court, Lauren S. Holland, Judge. 270 Or App 41, 346 P3d 626 (2015).

** Nakamoto, J., did not participate in the consideration or decision of this case.

**LANDAU, J.**

The issue in this case is whether police unlawfully interrogated a criminal defendant after he invoked his rights to counsel and against compelled self-incrimination, guaranteed by Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution. The state argues that defendant had asked a "confusing" question and that police responded by seeking "clarification," which did not amount to unconstitutional interrogation. Defendant argues that he had merely asked why he had been taken into custody and whether he could make a phone call, that there was nothing particularly confusing about the requests, and that police responded with questions that were reasonably likely to—and in fact did—elicit incriminating evidence. As a result, he contends, that incriminating evidence should have been suppressed. The trial court agreed with the state and denied defendant's motion to suppress. The Court of Appeals affirmed. *State v. Boyd*, 270 Or App 41, 346 P3d 626 (2015). For the reasons that follow, we conclude that defendant is correct that the police unconstitutionally interrogated him, in violation of Article I, section 12.

The relevant facts are not in dispute. Defendant's girlfriend, Archibald, was found dead on the street, the victim of a severe beating. Witnesses saw her on the ground and saw defendant running away from the scene. A few minutes later, police arrested defendant, who had Archibald's blood on his hands, shoes, and pants. The arresting officers advised defendant of his constitutional rights and questioned him. Defendant told the police that he was not sure what happened. He saw that his hand was bleeding and "figured" that he had been in a fight or had punched a car window. He said that he recalled that Archibald had become angry with him because she thought he had pushed her and that she had hit him several times. But he denied hitting her, insisting that he would never hit a woman. He repeatedly asked about Archibald's welfare.

The officers took defendant to the police station. There, Detective Myers questioned him while Sergeant Lewis observed. Defendant again said that he could not

remember what had happened and that, given the injury to his hand, he must have "either punched somebody's car or punched somebody." He said that he knew that he "was pissed off, because I was arguing with my girl." He then stated that "I don't know why I'm here, so—please don't talk to me anymore on that aspect until you bring me a lawyer."

Myers told defendant to change into jail clothes. As defendant did that, he asked Myers why he had been arrested. Myers told him that Archibald was dead and that he was being arrested for her murder. Defendant became agitated, expressing disbelief:

"A:   Whoa, whoa, whoa, what the fuck you mean, my girlfriend is dead, man?

"Q:   She's dead.

"A:   No, no, no, no—Ally's at home.

"Q:   Change your clothes. Let's go.

"A:   Ally's at home.

"Q:   Have a seat and change your clothes. That's all you've got to do. Relax and change your clothes.

"A:   What you mean, my girlfriend's dead, man? That's not, no, no, no, we just had an argument. I left her—my girl ain't dead. My girl is drunk at home with the baby. I don't—fuck what y'all is saying, and why the fuck are all of you mother-fuckers gathering up on me?

"Q:   We are not gathering up on you. We'd just like you to change your clothes, sit down and we'll get through the process.

"A:   All right, but my girl ain't dead. My baby is at home, peaceful. No, I refuse to even entertain that thought. Fuck you, you can kiss my ass. My baby's at home with the baby. She's at home where she ought to. No, hell no, fuck you, you can kiss my ass. No, my baby is fine. I don't give a fuck what y'all—my baby is at home with Elija. I wouldn't give a fuck what y'all talking about. Fuck that shit.

"Q:   You want to slide your pants over here?

"A:   Man, listen. Fuck that, my baby ain't dead. My baby is at home with the baby. [inaudible] No, no, no—

"Q: You just sit here until officers come to take possession of your things. Can someone transport him? Put your hands behind your back. I'll try hard not to [inaudible] them too hard. I know you got a bum finger.

"A: I'm not about to fight you because my baby ain't dead [inaudible] I don't know what the fuck happened tonight, but my baby ain't dead."

Lewis observed the foregoing interchange between defendant and Myers.

About seven hours later, Lewis learned that defendant had been transferred to a holding cell with a sink and running water. Concerned that defendant could have washed his hands and destroyed potential evidence, he went to defendant's cell. He checked defendant's hands and, apparently satisfied that defendant had not washed them, turned to leave. Defendant spoke to Lewis, asking, "Is anybody going to tell me why I'm here? I need to call my baby girl because she's going to wonder where I'm at." As Lewis later recalled in testimony at a suppression hearing, the following exchange then occurred:

"A: I asked him if he didn't remember Detective Myers telling him why he was here, and he replied, 'no, I don't remember nothing about that or talking to nobody.'

"Q: Then what?

"A: I asked him, when he was talking about his baby girl, if he was referring to *** Archibald and he said that he was, and then I just told him that I was present when Detective Myers told him that she was dead and he was under arrest for killing her, and he got real agitated and started breathing heavy and clenching his fists and told me, 'no, no, she ain't dead, you're lying' and then he tells me 'I want to talk to the detective that you said I talked to.'"

Lewis went to get Myers, who arrived at defendant's holding cell within minutes. Once there, Myers reminded defendant that he had earlier asked to speak with a lawyer and asked him if he still wanted one. Defendant said that he did not want a lawyer but wanted to talk to Myers about what had happened. Myers advised defendant of his *Miranda* rights and again asked if defendant wished to

speak to him without a lawyer present. Defendant said, yes. In the ensuing interview, defendant described an altercation with Archibald during which she had hit him repeatedly, making him angry so that "he felt like bashing her fucking head." He recalled that he had pinned Archibald against a van and then hit her once, causing her to fall and hit her head on the ground. Defendant asserted that, after hitting Archibald, he had "blacked out and just took off walking." When Myers told defendant that Archibald's injuries were inconsistent with a single punch, defendant requested an attorney, and the interview ended.

The state charged defendant with Archibald's murder. Before trial, defendant moved to suppress his statements to Myers, arguing that they were obtained in violation of his right against compelled self-incrimination under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution. He argued that the police had "either circumvented or coerced" him into making those statements in spite of his explicit invocation of his right to speak to an attorney. The trial court denied the motion, holding that defendant had knowingly and voluntarily waived his right to counsel. The trial court explained that the interview with Myers had occurred "only upon defendant's request to have further contact with *** Myers" and only after Myers readministered *Miranda* warnings.

During the trial to the court, the state introduced evidence of defendant's statements to Myers, in particular, defendant's statement about being angry with Archibald and that he "felt like bashing her fucking head." Defendant did not dispute that he had killed Archibald. His defense was that he lacked the requisite culpable mental state. In support of that defense, he took the stand and testified that he had never intended to hurt Archibald, that he had been unaware of punching her at the time, and that he did not remember doing so after the fact. In rebuttal, the state presented the testimony of a psychological expert who had relied in part on defendant's statements to Myers to reach his conclusion that defendant was malingering. The trial court convicted defendant of murder, ORS 163.115, and sentenced him to imprisonment for life.

On appeal, defendant argued that the trial court erred in denying his motion to suppress his statements to Myers after he invoked his right to counsel, and that the error was prejudicial. He also asserted an unpreserved argument that the trial court should have suppressed the statements that he made to the police *before* he invoked his right to counsel, on the ground that the advice of his rights when he initially was contacted by the police was defective.

The Court of Appeals affirmed. The court concluded that, because Lewis's responses to defendant's questions were not of a sort that the officer should have known would be likely to produce an incriminating statement from defendant, it was not a reinitiation of interrogation. *Boyd*, 270 Or App at 47. The court explained that defendant *himself* had reinitiated interrogation, by "request[ing] to speak to Myers, indicating his desire for a generalized discussion about the investigation." *Id.* at 48. The court concluded that, in light of Myers's readministration of *Miranda* rights, the passage of time between defendant's invocation and his profession of a wish to speak to Myers without a lawyer, and the absence of any evidence of mental impairment, the trial court had not erred in finding that defendant had knowingly and voluntarily waived his right to be questioned only in the presence of counsel. *Id.* Finally, the court rejected defendant's unpreserved contention that the initial advice of rights was inadequate without discussion. *Id.* at 43.

On review before this court, defendant argues that he did not reinitiate interrogation; rather, he asked routine questions associated with being taken into custody. In defendant's view, it was the police that reinitiated interrogation, when Lewis questioned him about his lack of memory about the earlier conversation concerning the assault on Archibald. Defendant asserts that, once he asserted his right to refrain from speaking with police without counsel present, police were prohibited by Article I, section 12, and the Fifth Amendment from asking *any* direct questions in the absence of a waiver of that right. At the least, defendant contends, police were forbidden to ask questions that were likely to elicit incriminating information. In this case, he argues, the questions that Lewis posed to him were likely

to do just that, given the fact that defendant already had denied remembering the assault. Defendant also reprises his unpreserved contention that, at all events, the initial advice of rights that he received was constitutionally inadequate.

The state argues that defendant is wrong in asserting that Article I, section 12, forecloses questioning of any sort once a defendant has invoked a right to counsel. In the state's view, all that is prohibited is asking questions that are likely to elicit incriminating information from the defendant. In this case, the state contends, defendant's questions about why he was in custody were "confusing," given that defendant had been told several hours earlier why he had been arrested. In light of the confusing nature of defendant's questions, the state argues, it was lawful for Lewis to ask "clarifying" questions that were not reasonably likely to elicit an incriminating response. In any event, the state contends, the incriminating information at issue—defendant's statement that he intended to beat Archibald—derived from Myers's questioning, not Lewis's. And that occurred only after defendant expressly waived his constitutional rights and demanded to speak to the officer.

Defendant replies that, although he did demand to speak with Myers, that demand was a direct result of Lewis's interrogation, *before* any waiver of constitutional rights.

At the outset, we reject without discussion defendant's contention that the initial advice of rights was constitutionally inadequate. The parties' remaining contentions are rooted both in Article I, section 12, of the Oregon Constitution and in the Fifth Amendment. We begin with defendant's arguments under Article I, section 12. *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court generally considers state law questions before reaching federal constitutional claims). But, because this court's case law under that section of the state constitution has relied heavily on federal Fifth Amendment doctrine, we precede our state constitutional analysis with a brief summary of federal law to provide some context.

The Fifth Amendment to the United States Constitution provides that, "[n]o person shall *** be

compelled in any criminal case to be a witness against himself." In *Edwards v. Arizona*, 451 US 477, 484-85, 101 S Ct 1880, 68 L Ed 2d 378 (1981), the United States Supreme Court held that, once a suspect invokes his or her Fifth Amendment rights, there can be no "further interrogation by the authorities until counsel has been made available *** unless the accused *** initiates further communication, exchanges, or conversations with the police." Left undefined in *Edwards* were what the Court meant by an accused "initiat[ing]" further communication, as well as the nature of the "interrogation" that must cease until the accused does so.

The Court addressed the first issue in *Oregon v. Bradshaw*, 462 US 1039, 103 S Ct 2830, 77 L Ed 2d 405 (1983). In that case, the defendant asked a police officer on the way to jail, "Well, what is going to happen to me now?" A plurality of the Court concluded that the defendant, in posing that question, had "initiated" further communication with the police for Fifth Amendment purposes. In reaching that conclusion, the Court distinguished the defendant's questions from what it described as "routine inquiries":

> "There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*."

*Id.* at 1045. The four justices who dissented did not take issue with the plurality's definition of what amounted to "initiating" a conversation; rather they disputed the plurality's application of that test to the particular facts, concluding that the defendant's question did not indicate a desire for a generalized discussion about the investigation. *Id.* at 1055-56 (Marshall, J., dissenting).

The Court addressed the second issue in *Rhode Island v. Innis*, 446 US 291, 100 S Ct 1682, 64 L Ed 2d 297 (1980). In that case, the defendant was arrested for murder

and advised of his *Miranda* rights, after which he asked to speak with a lawyer. On the way to the police station, two police officers who accompanied the defendant did not question him. They did talk among themselves, noting that (among other things) a child from a school for handicapped children near where the murder had occurred might find the gun with which the murder victim had been shot and accidentally shoot someone. Hearing the conversation, the defendant told the police to return to the scene of his arrest, so that he could show them where he had left the gun. *Id.* at 293-95. Following the defendant's arrest for the murder, he moved to suppress the gun and his statements to the police, on the ground that the evidence had been obtained in violation of his Fifth Amendment rights. The trial court denied the motion, but the Rhode Island Supreme Court reversed. *Id.* at 295-97.

The United States Supreme Court vacated the decision of the Rhode Island Supreme Court. A majority of the Court concluded that, for Fifth Amendment purposes, "interrogation" refers "not only to express questioning, but also to any words or actions on the part of the police \*\*\* that [they] should know are reasonably likely to elicit an incriminating response." *Id.* at 301. That test, the majority said, "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* Applying that test, the majority concluded that the police conversation was not of a sort that the officers should have known was likely to elicit an incriminating response. *Id.* at 303. The majority noted that there was no evidence that the officers knew that defendant was "peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children." *Id.* Three justices dissented, two of whom agreed with the majority's definition of what constituted "interrogation," but disputed its application of the test to the facts of that case. *Id.* at 305-06 (Marshall, J., dissenting).

The *Innis* test was ambiguous, to say the least. In particular, it was not clear whether "interrogation" included any and all direct questioning on the part of police or only questioning that police should have known was likely to elicit an incriminating response. Portions of

the Court's opinion in *Innis* appeared to support either interpretation.[1]

In *Pennsylvania v. Muniz*, 496 US 582, 110 S Ct 2638, 110 L Ed 2d 528 (1990), the court returned to the issue of what constitutes Fifth Amendment "interrogation." The Court was confronted with an argument that certain questions—those that are routine in the booking process—do not constitute interrogation because they are not intended to elicit information for investigative purposes. A plurality of the Court rejected that argument, but held that replies to such questions are admissible under a "routine booking exception" to the *Miranda* rule. *Id.* at 600-02. But the same plurality suggested that certain other questions—specifically, questions about whether a suspect in custody understood the instructions he had been given about a breathalyzer test and was willing to submit to the test—did not constitute interrogation within the meaning of *Miranda* at least in part because those questions were "not likely to be perceived as calling for any incriminating response." *Id.* at 605. The Court thus appeared to adopt the view—without expressly addressing the issue, to be sure—that "interrogation" does not include all forms of direct questioning.

Not surprisingly, federal circuit courts have split on the issue of what constitutes "interrogation." A few have held that, for Fifth Amendment purposes, "interrogation" includes any form of direct or express police questioning, regardless of content. *See, e.g.*, *Smiley v. Thurmer*, 542 F3d 574, 582 (7th Cir 2008) ("*Innis* does nothing more than define when police practices, *other than express questioning*, constitute interrogation.") (Emphasis in original.); *United States v. Montgomery*, 714 F2d 201, 202 (1st Cir

[1] The ambiguities of *Innis* go much further than that. It is not entirely clear, for example, whether the *Innis* test imposes an objective or a subjective test, or whether it focuses on perceptions of the suspect or the officer. Once again, the opinion itself provides something for everyone, leading to splits among lower courts in every imaginable direction. *See generally* Kyle C. Welch, *Asking the Scary Question: What Is the Correct Understanding of "Interrogation" Under Rhode Island v. Innis?*, 50 Cal W L Rev 233, 256 (2014) (describing "chaotic outcomes in cases where interrogation was the principal issue"); Alexander S. Helderman, *Revisiting* Rhode Island v. Innis: *Offering a New Interpretation of the Interrogation Test*, 33 Creighton L Rev 729, 738 (2000) ("There is little consistency among the federal circuit courts' interpretation of the *Innis* test.").

1983) ("Since the questioning here was express, we have no occasion to go farther. This was custodial interrogation."). Most hold that direct questioning, by itself, is not enough to amount to "interrogation" for Fifth Amendment purposes. *See, e.g.*, *United States v. Booth*, 669 F2d 1231, 1237 (9th Cir 1981) ("We hold, therefore, that custodial questioning constitutes interrogation whenever, under all the circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response from the subject.").

Article I, section 12, of the Oregon Constitution is phrased nearly identically to the Fifth Amendment in providing that, "[n]o person shall *** be compelled in any criminal prosecution to testify against himself." In consequence, this court has found case law applying the Fifth Amendment guarantee to be useful in construing the similarly worded guarantee of Article I, section 12.

In *State v. Kell*, 303 Or 89, 95-100, 734 P2d 334 (1987), this court concluded that the rule in *Edwards* that police must cease interrogation once a defendant has invoked his Fifth Amendment rights is "equally applicable" to Article I, section 12. *See also State v. Isom*, 306 Or 587, 593, 761 P2d 524 (1988) ("Upon request for counsel, questioning not only 'should' but must cease.").

In *State v. Meade*, 327 Or 335, 963 P2d 656 (1998), the court concluded that police could engage in further interrogation if a defendant "initiated" further discussion about the investigation into whether the defendant had committed a criminal offense. *Id.* at 340. The court concluded that whether a defendant "initiated" such further discussion depended on whether the defendant had shown that he or she "was willing to enter into a generalized discussion of the substance of the charges without the assistance of counsel." *Id.* That particular formulation of the test borrowed directly from the United States Supreme Court's decisions in *Bradshaw* and *Edwards*, although the court did not mention those cases by name.[2] *See also State v. McAnulty*, 356 Or 432, 456, 338 P3d 653 (2014), *cert den*, __ US __, 136

---

[2] In fact, the majority's borrowing from Fifth Amendment doctrine was one of the issues on which it and the dissent parted company. *Id.* at 351-52 (Durham, J., dissenting).

S Ct 34, 193 L Ed 2d 48 (2015) (Defendant "re-initiated" further conversation with authorities because her comments "expressed a willingness to continue a discussion about the investigation.").

This court likewise borrowed from federal case law in determining what constitutes "interrogation" for Article I, section 12, purposes. In *State v. Scott*, 343 Or 195, 166 P3d 528 (2007), the defendant was arrested on suspicion of murder, advised of his *Miranda* rights, and transported to the police station, where he was placed in an interview room. When two officers entered the room, the defendant said, "I would appreciate a lawyer present before I say anymore to you guys." As one of the officers turned on a recording device, defendant said two more times that he wanted to see a lawyer. The officer replied that he wanted to review the defendant's rights with him first and proceeded to reiterate his *Miranda* rights. The officer then asked whether the defendant had any questions about those rights, to which the defendant replied that he did not and that, because of what he had "seen on TV," he thought he needed a lawyer. The officer responded with a question: "You saw something on TV?" The defendant explained that he had seen a report that he had "killed somebody." The officer then replied, "Saying that you killed somebody, huh?," after which he waited eight to ten seconds before asking whether defendant wanted a particular lawyer. The defendant said that he "just want[ed] one here." The officer asked whether there was a particular lawyer that the defendant had worked with in the past, at which point the defendant stated that he no longer cared about a lawyer and that he was ready to speak with the officers. *Id*. at 198.

The defendant then made incriminating statements to the officers, which he later sought to suppress on the ground that the police did not cease interrogating him after he had invoked his right to counsel under Article I, section 12. The trial court agreed and suppressed the statements, and this court affirmed. At the heart of the parties' arguments on appeal was the meaning of the term "interrogation" for Article I, section 12, purposes. Both the defendant and the state tailored those arguments to the United States

Supreme Court's decision in *Innis*. This court responded by explicitly relying on that Fifth Amendment decision:

> "This court has emphasized that the constitutional protections afforded to suspects and criminal defendants set out in the Oregon Constitution require an analysis independent of similar protections set out in the United States Constitution. Here, however, the question does not concern the construction of any term set out in Article I, section 12; instead, our task involves defining a familiar term—'interrogation'—that both this court and the United States Supreme Court repeatedly have used to delineate situations in which *Miranda*-type warnings are required or *Miranda*-type rights are implicated under either the state or federal constitutions. Additionally, neither party contends, in the context of each one's arguments in this case, that the concept of interrogation carries any meaning different from the one that the United States Supreme Court articulated in *Innis*. In view of those considerations, we shall apply the Court's definition of the term interrogation, for purposes of *Miranda*'s Fifth Amendment requirements, to our analysis of defendant's Article I, section 12, rights at issue here."

*Id.* at 203. This court noted that whether that questioning amounted to "interrogation" for Article I, section 12, purposes depended on whether that questioning was of a sort that "the police should know is likely to elicit an incriminating response," taking into account "both the substance of the questions posed to [the] defendant and the manner in which those questions were asked." *Id.*

Turning to the particular police questions at issue, the court noted that the officer's questioning about what the defendant had seen on television was aimed at the very reason for the defendant's arrest for murder and that "any further discussion of that broadcast would serve only to prolong a discussion that [the] defendant had tried to terminate and, indeed would be reasonably likely to elicit some type of incriminating response." *Id.* at 203-04. The court observed that the officer's long pause after asking about the television broadcast—"Saying that you killed somebody, huh?"—provided the defendant "an invitation, and an opportunity, to provide an incriminating response." *Id.* at 204.

The court's analysis in *Scott* appears to dispose of defendant's argument in this case that any direct questioning by police after an invocation of Article I, section 12, rights amounts to "interrogation," as a matter of law. The court concluded that the officer's questioning in that case amounted to "interrogation" for Article I, section 12, purposes not merely because it was direct questioning, but because of "the substance of the questions posed to [the] defendant and the manner in which those questions were asked." *Id*. at 203. Moreover, the court read *Innis* to require the application of an essentially objective test—namely, whether the nature of the police questioning was such that it was reasonably "likely to elicit an incriminating response." *Id*.

Defendant insists that, although the court in *Scott* did apply the "likely to elicit incriminating evidence" test to direct questioning, the case "does not control the resolution of this case" because no one in *Scott* made the precise argument that he is making and because failing to conclude that direct questioning of any sort is "interrogation" is inconsistent with *Innis*. We are not persuaded by either argument.

It is true that the court qualified its decision in *Scott* with the observation that no one in that case had suggested that a different test should be applied. In subsequent cases, though, this court has cited *Scott* for the same test, without any such qualifications. *See, e.g.*, [*State v. Vondehn*](), 348 Or 462, 466 n 3, 236 P3d 691 (2010) (noting that whether police questions constitute "interrogation" for Article I, section 12, purposes depends on whether they are of a kind that "police should know [is] reasonably likely to elicit an incriminating response").

To the extent that any ambiguity remains about the test for determining whether "interrogation" has occurred we conclude in this case that *Scott* correctly stated the test for the following reasons. First, whether *Scott* was correctly decided is not necessarily determined by reference to whether it properly applied *Innis*. As this court often has observed, while it may from time to time borrow a doctrine or concept from federal court decisions when it interprets or

applies the state constitution, the court is doing so "because it finds the views there expressed persuasive, not because it considers itself bound to do so by its understanding of federal doctrines." *Kennedy*, 295 Or at 267.

Second, in any event, *Scott* is not inconsistent with *Innis* or later United States Supreme Court case law. We noted earlier that *Innis* itself is not a model of doctrinal clarity; the Court left notoriously unclear whether its "likely to elicit an incriminating response" test applied to direct questioning. The Court's later opinion in *Muniz*, however, strongly suggests that the *Innis* test does apply to direct questioning. The Court held that some forms of direct questioning—for example, questions about whether a person being asked to undergo sobriety testing understands the instructions and is willing to submit to the testing—do not constitute "interrogation" for Fifth Amendment purposes at least in part because such questions are not likely to elicit incriminating responses. 496 US at 605.

Third and finally, aside from the fact that *Scott* appears consistent with post-*Innis* federal case law, its holding makes sense on its own terms. The notion that all forms of direct questioning constitute "interrogation" for constitutional purposes is unrealistic. Some types of questions—"Would you like a glass of water?"—are often innocuous and do not implicate the constitutional concerns that form the underpinnings of Article I, section 12, and Fifth Amendment rights. *See generally* LaFave *et al*, 2 *Criminal Procedure* 854-55 (4th ed 2015) (cases holding that some "innocuous" questions do not implicate *Miranda* are "certainly correct"). The heart of both state and federal constitutional guarantees, after all, is protecting against compelled *incrimination*. *See generally* [State v. Davis](), 350 Or 440, 455-57, 256 P3d 1075 (2011) (reviewing history and prior case law regarding constitutional guarantees of "compelled self-incrimination"). In that regard, we find persuasive the discussion of the issue by the Court of Appeals for the Ninth Circuit in *Booth*. Holding that "interrogation" consists of not all police questioning, but only questioning that is reasonably likely to produce an incriminating response, the court explained:

"[W]e believe that the reasoning supporting the Court's decision [in *Innis*], indeed, the very purpose behind *Miranda* itself, compels the conclusion that not every question posed in a custodial setting is equivalent to 'interrogation.'

"*****

"*** Certainly not every question is an interrogation. Many sorts of questions do not, by their very nature, involve the psychological intimidation that *Miranda* is designed to prevent. A definition of interrogation that included any question posed by a police officer would be broader than that required to implement the policy of *Miranda* itself."

*Booth*, 669 F2d at 1237.

With the foregoing legal principles in mind, we turn to the issues in this case. As we noted, once a suspect has invoked the rights to remain silent and to counsel under Article I, section 12, police must immediately cease interrogation unless the suspect initiates further conversation with the police. *Isom*, 306 Or at 593. In this case, then, the questions are (1) whether defendant himself initiated further conversation with the police and, if not, (2) whether police continued unlawfully to interrogate him.

The Court of Appeals answered the first question in the negative. *Boyd*, 270 Or App at 47. On review before this court, defendant contends that the Court of Appeals was correct in that respect. The state contends that "defendant initiated a conversation" with Lewis by asking, "Is anybody going to tell me why I'm here, I need to call my baby girl because she's going to wonder where I'm at?"

We conclude that the Court of Appeals was correct. In arguing that defendant "initiated" further conversation with the police, the state focuses on whether any police interrogation that occurred was in any way prompted by something that defendant said first. That, however, is not the test. The test is whether a defendant's questions or statements indicate that he or she "was willing to enter into a generalized discussion of the substance of the charges without the assistance of counsel." *Meade*, 327 Or at 340. A defendant merely asking why he or she has been taken into custody does not satisfy that test, and the state does not appear to contend otherwise.

The Court of Appeals also answered the second question in the negative. The court explained that, when Lewis asked defendant whether he recalled having a conversation with Myers about defendant having killed his girlfriend and whether defendant had referred to his girlfriend as his "baby girl," those questions were not of such a nature that Lewis should have known they would likely elicit an incriminating response from defendant. *Boyd*, 270 Or App at 47-48. On review, defendant argues that the court erred in so concluding. The state, meanwhile, argues that the court correctly determined that Lewis's questions were merely "follow-up" questions intended to clarify the nature of defendant's inquiries.

We conclude that defendant is correct that the Court of Appeals erred. As this court explained in *Scott*, whether police questioning constitutes unlawful "interrogation" for Article I, section 12, purposes depends on whether "the substance of the questions posed to [the] defendant and the manner in which those questions were asked" demonstrated that they were "likely to elicit some type of incriminating response." 343 Or at 203-04. In this case, when defendant asked why he had been taken into custody, Lewis responded with questions of his own about whether defendant was referring to his girlfriend Archibald and whether he recalled the earlier conversation with Myers, when Myers told defendant that Archibald was dead. It should be recalled that Lewis was present when defendant had that prior conversation with Myers, and he was aware of defendant's response to that conversation. Specifically, Lewis knew that defendant had become agitated when told that his girlfriend had been killed, that he had disclaimed any memory of an altercation with his girlfriend, and that he had claimed not to remember how his hand had been hurt. Lewis knew that defendant had denied knowing that his girlfriend was dead and that, in fact, defendant had asserted at least six times that he did not believe that his girlfriend was dead. In other words, Lewis was well aware that defendant's memory of the assault was very much in issue and that posing the questions that he did was likely to agitate him. In that context, Lewis should have known that any further questioning about defendant's memory concerning the assault or the investigation into the

assault was reasonably likely to elicit from defendant an incriminating response, either in cornering defendant into a possibly far-fetched theory of the defense or in provoking him to make potentially inconsistent statements about his memory of the events that later could be used to impeach him.

The state argues in the alternative that, even if Lewis's questions constituted unlawful interrogation, those questions did not produce any incriminating information. According to the state, the incriminating statements that defendant sought to suppress occurred only after defendant told Lewis that he wanted to talk to Myers. Citing *State v. Acremant*, 338 Or 302, 108 P3d 1139, *cert den*, 546 US 864 (2005), the state argues that, even when an officer disregards a suspect's invocation of Article I, section 12, rights, the suspect may later validly waive his or her rights and speak with police so long as the defendant's later renewal of contact with police was not a product of the earlier unlawful interrogation.

We are not persuaded by the state's alternative argument. In *Acremant*, the defendant was arrested in Stockton, California, on suspicion of having committed two murders in Oregon. He was transported to the local police station. Two Oregon police detectives met with the defendant, informed him of his *Miranda* rights, and confirmed that the defendant understood those rights. *Id.* at 317-18. The defendant spoke with the detectives for a short time, but then invoked his right to counsel. The Oregon detectives said that they were "disappointed" that the defendant had elected to end the interview, that they were interested in hearing his side of the story, and that they were curious about his motive for the murders. There followed an approximately 13-minute conversation about the investigation, including the detectives' theory of his motive for the crimes. The two Oregon detectives ultimately left, saying to the defendant that they would be in Stockton for a few more days and that, if he decided that he wanted to talk to them, he should let the jail staff know. *Id.* at 318-19.

About an hour later, the defendant knocked on the door of the interview room and asked to speak to the

detectives from Oregon. Shortly after that, two different Oregon detectives met with him, readvised him of his constitutional rights, and interviewed him. During that interview, the defendant made inculpatory statements about the two murders. *Id.* at 319. The defendant later moved to suppress those statements, but the trial court denied the motion. *Id.* at 320-21.

On review of the denial of the motion, this court affirmed. The court began by concluding that the first two Oregon detectives had indeed violated the defendant's rights under Article I, section 12, when they continued to probe him about the murders after he had invoked his right to counsel. *Id.* at 322. But the court concluded that the inculpatory statements that the defendant later made to the police need not be suppressed, because the prior unlawful interrogation had not "induced" the defendant to make them. *Id.* at 322-23. The court noted that the first two detectives had left the defendant alone for an hour, after which time he reinitiated contact with them on his own. *Id.* at 323.

This case is distinguishable. In *Acrement*, there was a clear break of approximately one hour between the unlawful interrogation and the defendant's later unprompted reinitiation of contact with the police. In this case, there was no break at all. In this case, unlike *Acremant*, there was a causal connection between Lewis's interrogation of defendant and defendant's request to talk with Myers. After defendant asked why he had been taken into custody, Lewis asked defendant if he remembered Myers telling him why he had been arrested and stated further that, in fact, Lewis remembered Myers telling defendant that he had been arrested for killing his girlfriend. Defendant immediately became "agitated" and responded that, "no, no, she ain't dead, you're lying and *** I want to talk to the detective that you said I talked to." Defendant's request to speak with Myers thus was hardly unprompted. It was a direct response to Lewis's interrogation of defendant in violation of Article I, section 12.

We conclude that police interrogated defendant in violation of his state constitutional right to counsel and that the incriminating statements to Myers that resulted from

that violation should have been suppressed. The state concedes that, if the trial court erred in failing to grant defendant's motion to suppress, the admission of his statements was not harmless. The case therefore must be reversed and remanded for a new trial. Because of our decision on state constitutional grounds, we need not address the parties' arguments under the Fifth Amendment.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.