348 December 3, 2025 No. 1037

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARCUS ESA PAUL,
*Defendant-Appellant.*

Washington County Circuit Court
22CR36216; A180290

En Banc

Oscar Garcia, Judge.

Argued and submitted on September 25, 2024; resubmitted en banc, September 23, 2025.

Marc Brown, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Joanna Hershey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Chief Judge, Ortega, Egan, Tookey, Shorr, Aoyagi, Powers, Kamins, Pagán, Joyce, Hellman, Jacquot, and O'Connor, Judges.

SHORR, J.

Convictions on Counts 3, 4, and 5 reversed and remanded; remanded for resentencing; otherwise affirmed.

Shorr, J., filed the opinion of the court in which Lagesen, C. J., Ortega, Egan, Powers, Joyce, Hellman, Jacquot, and O'Connor, JJ., joined

Aoyagi, J., concurred in part and dissented in part and filed an opinion in which Tookey, Kamins, and Pagán, JJ., joined.

**SHORR, J.**

Defendant appeals from a judgment of conviction for one count of second-degree kidnapping, ORS 163.225 (Count 1); one count of unauthorized use of a vehicle (UUV), ORS 164.135 (Count 2); and three counts of first-degree criminal mistreatment, ORS 163.205 (Counts 3 through 5). He raises seven assignments of error. His first assignment of error challenges the lack of a jury instruction on the culpable mental state for the "assumption-of-care" element of first-degree criminal mistreatment. His remaining assignments of error challenge the trial court's denial of his motions for judgment of acquittal (MJOAs) for first-degree criminal mistreatment; the denial of his motions to change venue; and the denial of his MJOA for second-degree kidnapping. We reverse and remand the first-degree criminal mistreatment convictions, based on his first assignment of error, and otherwise affirm.

Initially, we provide a brief overview of the facts and recite in our analysis the particular facts relevant to each assignment of error. Early one morning at a parking lot in Tualatin, in Washington County, defendant noticed a parked van that was left running and unattended. Defendant decided to steal the van. He got into the vehicle without looking around and drove away quickly with the objective of driving to Portland. At some point on the drive, he noticed that there was a baby, L, in the backseat. L was 9-months-old at the time. After he noticed the baby, defendant took the next exit off the freeway, passing by several businesses and houses. He intended to leave the baby on the front porch of a house, but he panicked when he saw someone and ultimately took L out of his car seat and left him in Oregon City, Clackamas County, on the side of the road in the brush, out of sight of neighboring houses and with a steep embankment on one side. Defendant then continued on to Portland. A woman who was walking her dog in the neighborhood found L later that same morning, apparently unharmed. Police later arrested defendant in Portland. He was charged with one count of second-degree kidnapping, one count of UUV, and three counts of first-degree criminal mistreatment. At trial, defendant testified in his own

defense. On cross-examination he acknowledged that he has a child himself and understands the needs of a 9-month-old child. He agreed that he left L in a dangerous place and that he had had opportunities to leave L in a safer location, but was concerned about getting caught. Following a jury trial, the jury found him guilty as charged.

## I.   FIRST-DEGREE CRIMINAL MISTREATMENT

Defendant's first, fifth, sixth, and seventh assignments of error all relate to the mental state required for first-degree criminal mistreatment. His first assignment of error challenges the trial court's failure to instruct the jury on the culpable mental state required for the "assumption-of-care" element of the crime. His fifth through seventh assignments challenge the sufficiency of the evidence to prove that element of the crime.

### A.   *Sufficiency of the Evidence*

We briefly address defendant's fifth through seventh assignments of error, which challenge the trial court's denial of his MJOAs on the first-degree criminal mistreatment counts. Because prevailing on those assignments would entitle defendant "to more complete relief—an acquittal, rather than a remand"—we address those assignments of error before turning back to defendant's first assignment of error. *State v. Primeaux*, 230 Or App 470, 473 n 1, 216 P3d 887 (2009), *rev den*, 349 Or 664 (2011).

At trial, defendant argued that he was entitled to judgment of acquittal on the criminal mistreatment charges because there was no evidence to prove that he assumed care of L with any culpable mental state. The state countered that he had assumed care and control over L either when he stole the van or when he removed L from the van. The court stated that the evidence was sufficient to go to the jury and denied those MJOAs without further explanation. On appeal, defendant renews his argument that the evidence did not support an inference that he assumed care of L, either knowingly or with criminal negligence. We review the denial of an MJOA by viewing the evidence "in the light most favorable to the state to determine whether a rational trier of fact, making reasonable inferences, could have found

the essential elements of the crime proved beyond a rea-
sonable doubt." *State v. Hall*, 327 Or 568, 570, 966 P2d 208
(1998).

As we explain further below, the assumption-of-
care element is a conduct element for the crime of first-
degree criminal mistreatment, requiring the state to prove
that defendant acted with a culpable mental state—specifi-
cally, the state had to prove here that defendant knowingly
assumed care of L. *See* 345 Or App 357-58. In this case, the
evidence, viewed most favorably to the state, could permit a
jury to make that finding. A jury could find that, after defen-
dant became aware of L's presence, he knowingly assumed
care of the infant at least by the time he made the conscious
decision to leave him in a dangerous and secluded area, if
not earlier when he continued to drive with an awareness
that L was in the backseat. As noted above, after defendant
noticed L in the backseat, he kept driving past businesses
and homes where he could have left L more safely than
on the side of the road. When defendant removed L from
the car, he took him out of his car seat and left him on the
ground, partially obscured by brush and the guardrail, with
the road on one side and a steep embankment on the other.
He acknowledged that it was a dangerous place to leave a
child. Although that evidence possibly could have supported
another reasonable inference about defendant's mental
state, we have explained that when the evidence supports
multiple reasonable inferences, "which inference to draw is
for the jury to decide." *State v. Bivins*, 191 Or App 460, 467,
83 P3d 379 (2004). The evidence was sufficient to create a
question for the jury about whether defendant knowingly
assumed care of L. Accordingly, the trial court did not err in
denying defendant's MJOAs on the criminal mistreatment
charges.

B.   *Jury Instruction*

We turn now to defendant's first assignment of error,
challenging the trial court's failure to give his requested
jury instruction. At trial, defendant requested that the
court instruct the jury that it had to find that defendant
"knowingly" assumed care of the baby. The court declined
to give the instruction, explaining:

"THE COURT:   I mean if you go in a vehicle, there's a child in there and that you're, you know, the driver, that you would assume[ ] at that point you're—you know, that's temporary care over the passenger, whoever it is. Whether it be anybody, a child or an adult, right?

"So I'm not—I don't believe that—I think the statute is fairly clear in this situation where the mental element part is. I'm not going to put it in this element here.

"* * * * *

"The uniform instruction, I'm going to give it on that. I believe it's following the statute the way it's designed, the way it's set up, all right. And I think the knowingly element parts reply specifically to the act itself, you know."

The court ultimately instructed the jury that, with respect to the assumption-of-care element of each count of criminal mistreatment, it had to find that defendant "assumed the care, custody, responsibility for the supervision of [L]."

On appeal, defendant contends that the trial court erred by declining to instruct the jury to find that he acted with a culpable mental state when he assumed care of the baby in order to convict him of first-degree criminal mistreatment. Defendant argues that the assumption-of-care element is a conduct element, requiring a minimum culpable mental state of knowledge.[1] Alternatively, defendant argues that it is a circumstance element which requires a minimum culpable mental state of criminal negligence. The state does not disagree that some mental state must apply to the assumption-of-care element. Indeed, the state seemingly agrees that the assumption-of-care element requires a knowing mental state, but contends that the instruction, as given, "adequately conveyed that the jury had to find that defendant assumed such responsibility knowingly"

_____

[1] At trial, defendant argued that because the statute for first-degree criminal mistreatment prescribes a "knowing" *mens rea* for one element, it should apply to all elements of the crime. Defendant cited ORS 161.115(1) which provides that where a statute "prescribes a culpable mental state but does not specify the element to which it applies, the prescribed culpable mental state applies to each material element of the offense that necessarily requires a culpable mental state." Defendant does not reprise that argument on appeal. Nor does the state assert that ORS 161.115(1) applies. Rather, defendant appears to assume ORS 161.115(2) applies, and the state does not argue otherwise. We therefore do not reach the issue of whether or how ORS 161.115(1) might apply in this case.

because an awareness of one's actions is inherent in the verb "assume."

"We review a trial court's refusal to give a requested jury instruction for errors of law." *State v. Reyes-Camarena*, 330 Or 431, 441, 7 P3d 522 (2000). "A criminal defendant is entitled to have the jury instructed in accordance with his or her theory of the case if the instruction correctly states the law and there is evidence to support giving it." *State v. McNally*, 361 Or 314, 320, 392 P3d 721 (2017).

We begin with an overview of the legal principles that guide our analysis. Every material element of a crime set out in the Oregon Criminal Code requires proof of a culpable mental state—either intent, knowledge, recklessness, or criminal negligence. *State v. Simonov*, 358 Or 531, 537-38, 368 P3d 11 (2016). An element of a crime is "material" unless it relates solely to the statute of limitations, jurisdiction, venue, or similar matters. *Id.* at 537. If the statute does not prescribe a culpable mental state for a certain material element, we generally utilize a two-step approach to determine which mental state applies. *State v. Haltom*, 366 Or 791, 802, 472 P3d 246 (2020); *see State v. Propp*, ___ Or App ___, ___, ___ P3d ___ (Dec 3, 2025) (slip op at 20) (explaining that, in the wake of more recent Supreme Court case law, "we understand *Haltom*'s two-step approach to be an available tool that we should use as appropriate"). First, we come to an initial conclusion by determining whether the legislature understood the element at issue to be a conduct, circumstance, or result element. *Haltom*, 366 Or at 802. Conduct elements require a minimum culpable mental state of knowledge, while result and circumstance elements require a minimum culpable mental state of criminal negligence. *Simonov*, 358 Or at 540. After coming to an initial conclusion based on those default rules, we then consider other evidence "directed at determining which mental state the legislature might have intended to attach to the element at issue *** to confirm or rebut any tentative conclusion reached under the default rule analysis." *Haltom*, 366 Or at 802.

At issue in this case is whether the assumption-of-care element is a conduct or circumstance element. The legislature has defined "conduct" as "an act or omission and

its accompanying mental state," ORS 161.085(4), and an "act" as "a bodily movement," ORS 161.085(1). The Supreme Court has further explained that the applicable mental state informs and shapes the meaning of "conduct," and that "the definitions of the mental states that apply to 'conduct' indicate that they do not merely apply to a particular bodily movement; they also more broadly apply to other elements that describe the nature, that is, the essential character, of the prohibited act." *Simonov*, 358 Or at 541; *see also State v. Carlisle*, 370 Or 137, 145, 515 P3d 867 (2022) (confirming that conduct elements are tied "in part" to a defendant's bodily movements, but also could include some elements that describe the essential character of the prohibited act).

In contrast, a circumstance element "does not change the essential character of the prohibited conduct," but rather is "an accessory fact that accompanies, not modifies, the defendant's conduct." *Simonov*, 358 Or at 542 (construing "circumstance" because there is no statutory definition of that term). In *Simonov*, the Supreme Court examined how conduct differs from circumstance. *Id.* at 541. The court explained that, for theft crimes, the value of the stolen property—which differentiates the different degrees of theft—is a circumstance element because it does not change the essential character of the prohibited conduct of taking another's property with the intent to deprive the owner of it.[2] *Id.* at 541-42. The court then turned to the crime of unauthorized use of a vehicle, ORS 164.135(1)(a), which at the time was defined as when a person "takes, operates, exercises control over, rides in or otherwise uses another's vehicle, boat, or aircraft without the consent of the owner." *Id.* at 546. The court explained that the nature or essential character of the act of UUV "is the use of a vehicle without the owner's consent." *Id.* at 549. Accordingly, the court concluded that lack of consent "is part of the conduct that the offense proscribes," requiring a minimum culpable mental state of knowledge. *Id.*

---

[2] That conclusion appears to be *dicta*. *Simonov* did not require the court to decide the requisite culpable mental state for the property-value element of theft crimes, nor whether that element is a circumstance element. In a later case, the Supreme Court specifically assumed without deciding that the culpable mental state for the property-value element of theft is criminal negligence. *State v. Shedrick*, 370 Or 255, 270, 518 P3d 559 (2022).

Applying those principles to this case, our task is to determine whether the assumption-of-care element is part of the conduct of first-degree criminal mistreatment or an attendant circumstance. First-degree criminal mistreatment can be committed in a variety of ways. As is relevant to this case, a person commits the crime of first-degree criminal mistreatment under ORS 163.205(1) if:

"(a)   The person, in violation of a legal duty to provide care for another person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of another person, intentionally or knowingly withholds necessary and adequate food, physical care or medical attention from that other person; or

"(b)   The person, in violation of a legal duty to provide care for a dependent person or elderly person, or *having assumed the permanent or temporary care, custody or responsibility for the supervision of a dependent person or elderly person, intentionally or knowingly*:

"* * * * *

"(B)   *Deserts the dependent person or elderly person in a place with the intent to abandon that person*; [or]

"(C)   *Leaves the dependent person or elderly person unattended at a place for such a period of time as may be likely to endanger the health or welfare of that person*."

(Emphases added.) The state charged defendant with three counts of criminal mistreatment, corresponding with the portions of the statute italicized above. On each of the three counts, the state alleged that defendant had "assumed the care, custody, or responsibility for the supervision of [L]."

In determining the culpable mental state for the assumption-of-care element, we begin by asking what the legislature intended or would have understood to be conduct. *Haltom*, 366 Or at 803. In this case, the criminal mistreatment statute identifies several actions or omissions that would constitute the prohibited conduct. Those actions or omissions—such as deserting the dependent person, pursuant to ORS 163.205(1)(b)(B)—require a physical act or bodily movement (or the omission thereof) on the part of the criminal actor, and thus, fall readily under the statutory

definition of "conduct." But for defendant to be convicted of criminal mistreatment as alleged in this case, the state also had to prove that defendant had assumed care of L. That element also requires a physical act or bodily movement on the part of defendant. *See Webster's Third New Int'l Dictionary* 133 (unabridged ed 2002) (defining "assume" as "to take upon oneself (to do or perform) **:** UNDERTAKE"). A person who owes no legal duty to a baby is not presumed to have any responsibility for the baby absent some physical manifestation of assumption of care. A person who merely happens upon an injured and unattended child may have a moral duty to help that child, but the legal duty to help that child does not arise until the adult engages in some conduct by which they take temporary care of the child.

As set out in the statute and as relevant to this case, the conduct of criminal mistreatment involves two actions on the part of the criminal actor—assuming care *and* failing to provide care in some way. As such, the assumption-of-care is integral to and part of the prohibited conduct. As noted in the previous MJOA discussion, a reasonable factfinder could find that defendant assumed care of L—a dependent 9-month old baby who could not care for himself—at least by the time he picked L up and physically removed him from the car and then left the baby in a dangerous and secluded area, if not earlier when he bypassed opportunities to return the child or leave him in a safer location. We therefore disagree with the dissent's conclusion that the assumption-of-care element was merely a preexisting fact rather than an action on the part of defendant necessary to the commission of the crime.[3] ___ Or App at ___ (Aoyagi, J., concurring in part and dissenting in part) (slip op at 5). We believe the legislature would have understood the conduct in ORS 163.205 to include the physical act of assuming care. We conclude that the assumption of care is a conduct element, and a default culpable mental state of knowledge applies. *Haltom*, 366 Or at 802.

We note also that the Supreme Court has previously concluded that certain elements, even those external to the

___

[3] For convenience and because the opinion dissents on the issue we are discussing, we refer hereafter to Judge Aoyagi's opinion as a "dissent," although we appreciate that the opinion concurs in part and dissents in part.

defendant's bodily movements, constituted conduct because they were part of the essential nature of the conduct. *See Simonov*, 358 Or at 546 (concluding that the owner's non-consent was "part of the nature or essential character of the act proscribed" by the UUV statute, and therefore, conduct); *Haltom*, 366 Or at 811 (concluding that the victim's nonconsent appeared to be "an integral part of the proscribed conduct" in second-degree sexual abuse); *but see Carlisle*, 370 Or at 155 (explaining that the legislature would not have understood "sexual contact" as a fundamentally consensual act, and therefore would not have considered consent to be part of the essential nature of the conduct described in third-degree sexual abuse). Unlike those closer cases, the assumption of care element here involves defendant's physical conduct and thus we need not decide whether textual and contextual clues indicate that something external to the defendant's bodily movements might nevertheless be understood as conduct.

Our opinion and the dissent diverge on the first step of the analysis—whether the element is conduct or circumstance. The dissent points out that the phrasing and placement of the assumption-of-care element suggest that it is a circumstance element. ___ Or App at ___ (Aoyagi, J., concurring in part and dissenting in part) (slip op at 5). We acknowledge that the use of the passive verb tense is not directly indicative of conduct. But we are wary of giving "greater prominence than * * * warranted to the legislature's use of a particular grammatical construction" because the Supreme Court has cautioned that those choices may not have particularly strong diagnostic value. *Haltom*, 366 Or at 807. Nor are we persuaded that the legislature's choice to place the assumption-of-care element before the enumerated mental state of "intentionally or knowingly" necessarily indicates that the legislature did not intend that mental state to apply to assumption-of-care. The legislature would have understood that assuming care is conduct involving a physical act of the defendant and that the default mental state of knowledge would apply. If it intended a different mental state to apply to the assumption of care, it would have specifically said so.

We also address the dissent's argument that the legislature was more concerned with the existence of the

duty relationship than how it came about, indicating that the assumption of care is a necessary attendant fact rather than a conduct element. ___ Or App at ___ (Aoyagi, J., concurring in part and dissenting in part) (slip op at 6-7). First-degree criminal mistreatment requires the defendant to owe a duty to the victim, which can come about either through "a legal duty to provide care" or by assuming permanent or temporary care for another. ORS 163.205(1). The dissent's argument that the duty relationship is an attendant preexisting fact is more persuasive in cases where the defendant is charged with first-degree criminal mistreatment for violating "a legal duty to provide care." We agree that a legal duty can arise years before the other actions of criminal mistreatment, indicating that it is a preexisting or attendant fact. But that argument does not apply when, as here, the assumption of care requires a physical act of assuming care contemporaneous with other conduct of criminal mistreatment. For instance, a babysitter who withholds care from a child may be charged with first-degree criminal mistreatment if their conduct also demonstrates an affirmative assumption of care (for example, agreeing to take the job and showing up as agreed upon). In contrast, a bus driver who allows an elderly passenger to disembark in a dangerous location would not be liable absent some affirmative conduct of assuming care.

Finally, we consider whether the legislative history suggests that the assumption-of-care element is a conduct or circumstance element. We agree with the dissent that the legislative history is not conclusive either way. ___ Or App at ___ (Aoyagi, J., concurring in part and dissenting in part) (slip op at 7-8). However, in the same hearing cited by the dissent, Committee Counsel explained that assuming the permanent or temporary care, custody or responsibility for the supervision of a dependent person or elderly person means "everyone that doesn't have a legal duty that's doing those things." Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2318, Mar 31, 1993, Tape 65, Side A (statement of Committee Counsel Holly Robinson). That statement describes assuming care in active terms—requiring the person to be "doing those things," with "those things" being assuming care, custody,

or responsibility—suggesting at least that the legislature understood the assumption-of-care element as describing conduct. For the foregoing reasons, we do not find the dissent's arguments regarding the grammatical construction, placement, nature of the element, or legislative history sufficiently persuasive to conclude that the legislature intended the assumption-of-care element to be circumstance rather than conduct. We disagree with the dissent's analysis as to step one.

Turning to step two of the analysis, we consider "arguments that might confirm or undermine [our initial] conclusion by showing that the legislature either did or did not intend a knowing mental state to attach." *Haltom*, 366 Or at 812. The state has presented no argument that the legislature intended a mental state other than knowledge to attach. *See id.* at 812-18 (considering at step two the state's arguments that the legislature did not intend a knowing mental state to apply). In fact, as we have noted, the state seemingly agrees that assumption of care requires a knowing mental state. Nor have we found any other evidence indicating that the legislature intended a different mental state, other than the default mental state of knowledge for a conduct element, to attach to the assumption-of-care element. Indeed, the severity of felony liability for first-degree criminal mistreatment "suggests that the legislature did not contemplate that mere criminal negligence would suffice to establish criminal liability." *Simonov*, 358 Or at 548.

To conclude this section, we agree with defendant that in order to convict him for first-degree criminal mistreatment, the jury had to find that he assumed care of L with knowledge. Here, the court did not instruct the jury that it had to find that defendant acted with any culpable mental state when he assumed care of the baby. Defendant was entitled to his requested, legally correct instruction, *McNally*, 361 Or at 320, and the court's failure to give the instruction was error.

C.   *Harmlessness*

Nevertheless, we will affirm the trial court's judgment if we determine that there was "little likelihood that

the error affected the verdict." *State v. Owen*, 369 Or 288, 323, 505 P3d 953 (2022). In making that determination, we consider the instructions "as a whole and in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges." *Id.* at 323-24. Instructional error is not harmless if "the trial court's failure to give the requested instruction probably created an erroneous impression of the law in the minds of the members of the jury and if that erroneous impression may have affected the outcome of the case." *Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106-07, 957 P2d 147 (1998).

In considering harmlessness, we briefly address the state's argument that the instruction given—to find that defendant "assumed" care of the baby—adequately conveyed to the jury that it had to find that defendant undertook that action knowingly. The state argues that inherent in the verb "assume" is a knowing awareness of one's actions. But in this unique factual situation, where the jury might have understood that defendant could have assumed care of L without knowledge as soon as he took the van with L in it, we conclude that the instruction did not adequately convey the mental state required.

Under the circumstances, we cannot say that there is little likelihood that the error affected the verdict. *See State v. Stone*, 324 Or App 688, 694-95, 527 P3d 800 (2023) (concluding that the trial court's failure to instruct on the culpable mental state for the physical-injury element of assault was not harmless, and accordingly reversing that conviction). Because the jury was not instructed on the culpable mental state for the assumption-of-care element, it did not need to decide whether defendant acted knowingly with respect to that element. It is unclear what the jury would have found had it been properly instructed. Defendant's theory of the case was that the evidence demonstrated that he never knowingly assumed care of L, and that his action of removing L from the van was undertaken to avoid assuming care. The state argued that defendant had to have assumed care of L when he became aware of the baby and removed him from the van, but also at various times argued that he had assumed care of the baby "when he stole that [van] with

the child in it." In that context and in light of the instructions given, we cannot conclude that the jury necessarily found that defendant knowingly assumed care of L. Accordingly, we reverse and remand the first-degree criminal mistreatment convictions.

## II.  VENUE

Because the issue may arise again on remand, we address defendant's second and third assignments of error, in which he argues that the court erred in denying a motion for change of venue as to the kidnapping and criminal mistreatment charges.[4] At the pretrial hearing, defendant did not challenge venue as to the UUV charge, but contended that venue in Washington County was improper as to the second-degree kidnapping and first-degree criminal mistreatment charges because no element of either offense occurred in that county. The state argued that venue in Washington County was proper on several alternative bases. The court denied the motion without articulating on which basis it determined that venue was proper in Washington County.

At the outset, the parties disagree over the scope of the record that we may consider on appeal. Our general rule is that our review of a pretrial ruling "is limited to the record as it had developed at the time of the ruling; we do not evaluate a court's pretrial decision with the benefit of hindsight by, for example, taking into account what happened at trial." *State v. Sperou*, 365 Or 121, 137, 442 P3d 581 (2019). Defendant has not persuaded us that we should deviate from that general rule.

Turning to the merits, we consider whether the trial court erred in denying the motion to change venue. The parties agree that defendant's last known address was in Washington County and, based on the record and assumed facts at the time of the venue hearing, the court could find

---

[4] Before trial, defendant filed a motion to dismiss for improper venue. On appeal, both parties agree that dismissal is not a proper remedy for a pretrial venue challenge, but that the trial court treated the motion to dismiss as a motion to change venue. We agree with that framing of the trial court's decision. The trial court explicitly stated that it was "going to deny the motion for a change of venue in this case." We therefore review the trial court's ultimate decision, which was that venue was proper and it would not order a change of venue.

that defendant stole the car in Washington County.[5] The parties also agree that both the kidnapping and criminal mistreatment crimes at least partially occurred in Clackamas County, when defendant moved L out of the vehicle and left him on the side of the road. What is less clear is whether any essential element of second-degree kidnapping or first-degree criminal mistreatment occurred in Washington County.

Generally, venue is proper "in the county in which the conduct that constitutes the offense *** occurred." ORS 131.305(1). To establish venue in a particular county, "it is sufficient that at least one essential element of a charged offense occurred in the county in question." *State v. Harris*, 242 Or App 438, 441, 256 P3d 156, *rev den*, 351 Or 254 (2011); ORS 131.315(1) (providing that if conduct constituting elements of an offense occur in two or more counties, venue is proper in any of the counties concerned). ORS 131.325 provides:

"If an offense is committed within the state and it cannot readily be determined within which county the commission took place, or a statute that governs conduct outside the state is violated, trial may be held in the county in which the defendant resides, or if the defendant has no fixed residence in this state, in the county in which the defendant is apprehended or to which the defendant is extradited."

Thus, under ORS 131.325, when it cannot be readily determined precisely where an offense was committed, "trial may be held in the county in which the defendant resides." *See State v. Rose*, 117 Or App 270, 272, 843 P2d 1005 (1992), *rev den*, 316 Or 142 (1993) (Where the defendant raped a girl while on a drive and she could not describe where the crime occurred, we concluded that venue was proper in the defendant's county of residence.).

At the hearing on the venue challenge, the state argued that venue was proper on several grounds, including ORS 131.325. The pretrial record reflects that there was uncertainty as to where an essential element of the crimes of second-degree kidnapping and first-degree criminal mistreatment occurred—for kidnapping that disputed element

_____

[5] The state did not put on evidence at the pretrial hearing. Defendant did not object to that procedure. Both parties presented their arguments based on certain assumed facts, namely that defendant took the van while in Washington County and then removed L from the van in Clackamas County.

is the "intent to interfere substantially with another's personal liberty," and for criminal mistreatment the element is the assumption of care. As noted above, it is not disputed that the court could find that defendant stole the vehicle in Washington County, drove from there into Clackamas County, and eventually left L by the side of the road in Clackamas County. Defendant could not have committed the disputed element of each charged offense until he became aware of L's presence in the van, which happened at some point along the drive. It was unclear at the pretrial hearing when and where along that drive defendant intended to interfere with L's liberty and assumed care of L. Therefore, at the pretrial hearing, it could not be readily determined that the offenses were wholly committed within Clackamas County. Under the circumstances, where it could not be "readily determined" where the offense was committed, the trial court did not err in applying ORS 131.325 and determining that venue was appropriate in Washington County, defendant's listed place of residence.

## III.   KIDNAPPING

Finally, we turn to defendant's fourth assignment of error, which challenges the trial court's denial of his MJOA on Count 1, second-degree kidnapping. As stated above, we review the facts "in the light most favorable to the state to determine whether a rational trier of fact, making reasonable inferences, could have found the essential elements of the crime proved beyond a reasonable doubt." *Hall*, 327 Or at 570.

Defendant challenges the sufficiency of the evidence only as to one element of second-degree kidnapping—whether the state proved that defendant had the "intent to interfere substantially with [L's] personal liberty."[6] ORS 163.225(1). To prove that intent, the state must show that the defendant either intended to move the victim a substantial distance or to confine the victim for a substantial period of time.[7] *State*

---

[6] In addition to the intent element, the state also had to prove that defendant took L "from one place to another" and that that action was "without consent or legal authority." ORS 163.225(1)(a).

[7] In *Mejia*, the Supreme Court explained that the state may prove the intent element of kidnapping in either of those two ways even when, as here, a defendant is charged with kidnapping by taking the victim from one place to another under

*v. Mejia*, 348 Or 1, 11-12, 227 P3d 1139 (2010). That intent may not merely be incidental to the commission of some other crime. *Id.* at 8. The Supreme Court has explained that "minimal movement that amounts to incidental conduct that might accompany some other crime is, standing alone, insufficient proof of intent to support a conviction." *State v. Zweigart*, 344 Or 619, 636, 188 P3d 242 (2008), *cert den*, 558 US 829 (2009). Defendant asserts that his intent was to steal a van and drive it to Portland—not to interfere with L's liberty—and that any interference with L's liberty was merely incidental to his commission of the crime of UUV.

We disagree with defendant that the evidence, viewed in the light most favorable to the state, was insufficient to establish the intent element of second-degree kidnapping. The evidence demonstrated that, after discovering L, defendant exited the highway, deviating from his route to Portland, in order to remove L from the vehicle and leave him in a relatively remote location. That evidence could allow a jury to conclude that once he discovered L's presence, defendant formed a new, independent intent to hide L in order to minimize the risk of discovery, that was separate from his original intent to steal the vehicle. *See State v. Soto*, 372 Or 561, 575, 551 P3d 893 (2024) (explaining that action is not incidental if it is not an "inherent or necessary component of the defendant's underlying crimes"). The evidence also supports a conclusion that defendant intended to interfere with L's personal liberty. Defendant testified that he considered leaving L in front of a house, but ultimately panicked and decided to leave L in the brush, on the side of the road behind the guardrail, by the side of a steep embankment. He left L on a portion of the street without houses, and where he would be out of the direct line of sight of any houses. Notwithstanding the fact that defendant left L outdoors and unrestrained, the evidence suggests that defendant intended to keep L hidden in a particular location. Defendant's decision to leave a 9-month-old baby, who would be unable to relocate himself to safety, in a dangerous and isolated location, could allow a jury could infer that defendant had an intent to confine or move L in a way that would

---

ORS 163.225(1)(a), rather than confinement under ORS 163.225(1)(b). *State v. Mejia*, 348 Or 1, 11-12, 227 P3d 1139 (2010).

interfere substantially with L's personal liberty. *Mejia*, 348 Or at 12 (evidence which "resembles \*\*\* '[s]ecretly confining [a] person in a place where the person is not likely to be found,' ORS 163.225(1)(b)," can be probative of the intent element). We therefore conclude that the trial court did not err in denying defendant's MJOA on Count 1, second-degree kidnapping.

Convictions on Counts 3, 4, and 5 reversed and remanded; remanded for resentencing; otherwise affirmed.

**AOYAGI, J.,** concurring in part and dissenting in part.

I write separately to address the criminal mistreatment counts. The majority holds that the caregiver element of first-degree criminal mistreatment is a conduct element with an attendant minimum culpable mental state of knowledge. I disagree. I would hold that it is a circumstance element with an attendant minimum culpable mental state of criminal negligence. With that understanding of the statute, I would reach the same result as the majority on the fifth through seventh assignments of error—affirming the denial of the motions for judgment of acquittal—although my reasoning would differ. I would reach a different result, however, on the first assignment of error, regarding the jury instructions. Although I agree that it was error not to impose any culpable mental state requirement for the caregiver element, I would hold that the trial court should have instructed the jury that *criminal negligence* is required for that element, and I would further hold that *that* instructional error was harmless in this case. I would therefore affirm the criminal mistreatment convictions and, accordingly, dissent.

ORS 163.205(1) defines the crime of first-degree criminal mistreatment:

"(1)   A person commits the crime of criminal mistreatment in the first degree if:

"(a)   The person, in violation of a legal duty to provide care for another person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of another person, *intentionally or knowingly withholds*

*necessary and adequate food, physical care or medical atten-*
*tion from that other person*; or

"(b)   The person, in violation of a legal duty to provide care for a dependent person or elderly person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of a dependent person or elderly person, intentionally or knowingly:

"(A)   Causes physical injury or injuries to the dependent person or elderly person;

"(B)   Deserts the dependent person or elderly person in a place with the intent to abandon that person;

"(C)   Leaves the dependent person or elderly person unattended at a place for such a period of time as may be likely to endanger the health or welfare of that person;

"(D)   Hides the dependent person's or elderly person's money or property or takes the money or property for, or appropriates the money or property to, any use or purpose not in the due and lawful execution of the person's responsibility;

"(E)   Takes charge of a dependent or elderly person for the purpose of fraud;

"(F)   Leaves the dependent person or elderly person, or causes the dependent person or elderly person to enter or remain, in or upon premises [where a cannabinoid extract is being processed without a license];

"*****

"(G)   Leaves the dependent person or elderly person, or causes the dependent person or elderly person to enter or remain, in or upon premises [where certain unlawful drug manufacturing has occurred or is occurring]."

(Emphases added.) Defendant was charged with three counts of first-degree criminal mistreatment, based on the three acts or omissions italicized above.

The element at issue in this case is phrased slightly differently in the two paragraphs. In paragraph (1)(a), the element is "in violation of a legal duty to provide care for another person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of

another person." ORS 163.205(1)(a). In paragraph (1)(b), the element is "in violation of a legal duty to provide care for a dependent person or elderly person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of a dependent person or elderly person." For simplicity's sake, I refer to both versions as the "caregiver element" of first-degree criminal mistreatment. I also focus my analysis on the second half of the caregiver element— the "having assumed the permanent or temporary care, custody or responsibility" portion—based on how defendant was charged in this case.

        The caregiver element is necessarily a material element of the offense. *State v. Simonov*, 358 Or 531, 537, 368 P3d 11 (2016) ("An element is 'material' unless it relates solely to the statute of limitations, jurisdiction, venue or similar matters." (Internal quotation marks omitted.)). However, most elements are material, and it does not follow that they are part of the conduct element. *Id*. at 544 ("It could be argued, in a broad sense, that every element that is required to create criminal liability is part of the essential character of the defendant's act or omission. If that view were correct, the meanings of conduct and circumstance would confusingly overlap."). To determine what mental state the legislature intended to attach to the caregiver element, we must engage in statutory construction; that is, we must evaluate text, context, and any relevant legislative history and reach a conclusion as to what mental state was meant to be required. *State v. Haltom*, 366 Or 791, 803, 472 P3d 246 (2020); *State v. Propp*, ___ Or App ___, ___, ___ P3d ___ (Dec 3, 2025) (slip op at 18). What mental state is required for a given element "ultimately is a matter of legislative intent." *Simonov*, 358 Or at 546.

        The starting point for the analysis is whether the legislature would have understood the caregiver element as a conduct, circumstance, or result element. *Haltom*, 366 Or at 802 ("[W]e think that it is reasonable to initially focus on whether the legislature that enacted the statute intended or understood the element at issue as a circumstance or as part of the conduct that the statute proscribes. Focusing on that issue honors the default rule that is at the heart of the

*Simonov* analysis.").[1] In my view, the text, context, and legislative history all support it being a circumstance element.

Both paragraphs (1)(a) and (1)(b) contain an obvious conduct element, that is, an element that identifies acts or omissions by the defendant. *See* ORS 161.085(4) (defining "conduct" to mean "an act or omission and its accompanying mental state"); ORS 161.085(1) (defining "act" to mean "a bodily movement"); ORS 161.085(3) (defining "omission" to mean "a failure to perform an act the performance of which is required by law"). Paragraph (1)(a) specifies one omission in three variations: failing to provide food, physical care, or medical attention. Paragraph (1)(b) specifies seven separate acts or omissions: causing physical injury, abandoning, leaving unattended, etc.

The phrasing and placement of the caregiver element relative to the conduct element in each paragraph strongly suggests that it is a circumstance element, rather than being part of the conduct element. For one thing, the caregiver element is in a *different verb tense* from the conduct element—"having assumed" care, custody, or responsibility—such that it refers to a preexisting fact that is necessary to the crime (a material element) but that could have come into existence at any point in the past, *even years earlier.* A preexisting fact is consistent with a circumstance element. *See Simonov*, 358 Or at 542 (a "circumstance" is "an accessory fact" that "accompanies" but does "not modif[y]" the "defendant's conduct").

The placement of the caregiver element is even more telling. In both paragraphs, the legislature expressly imposed an "intentionally or knowingly" mental state requirement on the conduct element—that is, the listed acts and omissions—and placed that mental state requirement *after* the caregiver element, such that "intentionally or knowingly" *does not apply* to the caregiver element. *See*

---

[1] Since deciding *Haltom*, the Supreme Court has suggested that the two-step approach may not always be the best approach, depending on the case, and that there is at least some flexibility in how to conduct the analysis. *See State v. Carlisle*, 370 Or 137, 149, 515 P3d 867 (2022) (lead opinion); *id*. at 167 (Garrett, J., concurring); *see also Propp*, ___ Or App at ___ (slip op at 18-23) (describing the methodology required by *Simonov*, *Haltom*, and *Carlisle*). The two-step approach works well enough in this case, so I use it.

ORS 163.205(1)(a) ("*** having assumed the permanent or temporary care, custody or responsibility for the supervision of another person, *intentionally or knowingly* withholds necessary and adequate food, physical care or medical attention from that other person" (emphasis added)); ORS 163.205(1)(b) ("*** having assumed the permanent or temporary care, custody or responsibility for the supervision of a dependent person or elderly person, *intentionally or knowingly*" engages in any of seven acts or omissions (emphasis added)). If the legislature had intended the caregiver element to be part of the conduct element, then it is unlikely that it would have separated it from the conduct element in that way. Both the phrasing and placement of the caregiver element strongly suggest that the legislature viewed it as a circumstance element separate from the conduct element and subject to a different culpable mental state requirement.

There is also the nature of the element itself. Being responsible for someone else's care is a situation that may arise in a variety of ways, and the legislature appears to have been concerned only with the situation itself, not how it came about. Both paragraphs (1)(a) and (1)(b) apply to a person who has "a legal duty to provide care" to another person or has "assumed the permanent or temporary care, custody or responsibility for the supervision of" another person and who, while in that state, engages in certain acts or omissions. Legal duties to others arise from *legal* relationships, such as parent-child or guardian-ward. Care, custody, or supervisory responsibility may be assumed by various means, including through legal arrangements.[2]

The legislative focus on the *relationship* between the defendant and the other person, rather than what gave rise to that relationship, further suggests that the legislature would have understood the caregiver element as a circumstance element (a necessary attendant fact) rather than a conduct element. The focus on the relationship makes it

---

[2] The ordinary meaning of "assume" is "to take upon oneself (to do or perform): UNDERTAKE." *Webster's Third New Int'l Dictionary* 133 (unabridged ed 2002). Nothing about that definition suggests the need for a particular mental state. Certainly, it is often the case that someone intentionally or knowingly assumes a responsibility, but one may also assume a responsibility through recklessness or criminal negligence or even by mere virtue of one's legal status.

closer to a "status" than to conduct. *See Simonov*, 358 Or at 543 (discussing as "instructive" the distinction between "status" and "conduct" that is recognized for offenses outside the criminal code; "Although a particular 'status' sometimes is required to complete a crime, it generally is not part of the essential character of a proscribed act; in fact, the defendant's mental state usually has nothing to do with whether the status exists."). Of course, because criminal mistreatment is an offense within the Criminal Code, the caregiver element must be understood as a circumstance element, with an attached culpable mental state, not as a true status element with no attendant culpable mental state. *See* ORS 161.095(2) (requiring, for crimes within the Criminal Code, "a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state"); *State v. Owen*, 369 Or 288, 316-17, 505 P3d 953 (2022) (seemingly construing ORS 161.095(2) to preclude the possibility of a material element for which no culpable mental state is required). The element being more like a preexisting status, however, pushes it away from conduct and toward circumstance.

Finally, the legislative history supports viewing the caregiver element as a circumstance element. ORS 163.205 was enacted in 1973, amended in 1981, and amended again in 1993, at which point it read materially the same as it does now.[3] Or Laws 1973, ch 627, § 3; Or Laws 1981, ch 486, § 1; Or Laws 1993, ch 364, § 2. There is not much useful legislative history for present purposes, but what does exist suggests that the legislature understood the caregiver element as describing a circumstance of the defendant, not as a conduct element.

When the House Judiciary Crime and Corrections Subcommittee was considering the 1993 amendments, it received advice from counsel regarding their effect on existing law. *See* Minutes, House Judiciary Crime and Corrections Subcommittee, HB 2318, Mar 31, 1993, Tape 64, side B (statement of Committee Counsel Holly Robinson). Counsel provided a document that listed each possible way

---

[3] ORS 163.205 has been amended since 1993, but those amendments are immaterial here. *See* Or Laws 2017, ch 21, § 43; Or Laws 2005, ch 708, § 1.

of committing first-degree criminal mistreatment, with the "act" element of the crime broken out. As shown in the excerpt below, counsel identified the existence of a legal duty, care, or custody as a condition of the *actor*, not as part of the *act*:

| ACTOR | ACT | STATE OF MIND | PENALTY |
|---|---|---|---|
| Person with Legal Duty or Person with Care and Custody | Leaves unattended for such period of time as is likely to endanger health or welfare of Dependent or Elderly Person | Intentionally or Knowingly | HB 2318-3 amendments Criminal Mistreatment I Class C felony |
| Person with Legal Duty or Person with Care and Custody | Spends or uses property or money without express, voluntary consent of Elderly or Dependent Person | Intentionally or Knowingly | HB 2318-3 amendments Criminal Mistreatment I Class C felony |

Excerpt of Exhibit D, House Judiciary Crime and Corrections Subcommittee, HB 2318, Mar 31, 1993 (chart prepared by Committee Counsel Holly Robinson).

Committee counsel did the same orally, explaining to the subcommittee that the existing statute required the defendant to have a legal duty to the other person (with one exception), whereas the amendments would expand liability to an additional "category" of defendants, resulting in "two different kinds of people" being subject to criminal liability for all of the prohibited acts and omissions—those with a legal duty to the other person as the result of a relationship, court order, or contractual agreement, and those without a legal duty who had nonetheless assumed care, custody, or supervision. Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2318, Mar 31, 1993, Tape 65, Side A (statement of Committee Counsel Holly Robinson). The only relevant legislative history thus supports viewing the caregiver element as an expansion of liability based on the defendant's relationship to the other person—*i.e.*, a circumstance or status of the defendant—not as a new and additional conduct element for some defendants.[4]

---

[4] In full, what Robinson said on this point was as follows:

"It may be advantageous for this committee to adopt language that says—that inserts, after 'legal duty,' 'created by relationship, court, or contractual agreement,' to make clear who's in what category and who's not—who's in the other category. Given the fact that this bill—that the statute's growing, and you're ending up with two different kinds of people. I talked to legislative counsel about those words. I think it includes whoever might have a—quote, unquote—'legal duty.' But I think it will then make the issue of deciding who's

For all of those reasons, I view the text, context, and legislative history as supporting the conclusion that the legislature would have understood the caregiver element to be a circumstance element. That results in a "tentative conclusion" that the legislature intended the default culpable mental state requirement for a circumstance element—criminal negligence—to attach to the caregiver element. *See Haltom*, 366 Or at 802 (explaining "tentative conclusion" to be made after first step of analysis).

The only remaining question is whether anything in the text, context, or legislative history "confirms or rebuts" that tentative conclusion. *Id.* ("Evidence directed at determining which mental state the legislature might have intended to attach to the element at issue should then be considered to confirm or rebut any tentative conclusion reached under the default rule analysis."). I have found nothing that rebuts it. As for confirming it, the legislature's deliberate placement of the words "intentionally or knowingly" *after* the caregiver element suggests a conscious effort not to subject the caregiver element to that higher culpable mental state. If the legislature had intended an "intentionally or knowingly" mental state to attach to the caregiver element, then, logically, it would have placed "intentionally or knowingly" *before* the caregiver element. Its decision not to do so strongly suggests that it wanted that mental state to apply only to the prohibited acts and omissions. In other words, the legislature specified the element to which "intentionally or knowingly" applies—and it isn't the caregiver element.

---

assuming permanent care, custody, etc., etc., as being everyone that doesn't have a legal duty that's doing those things. So I would suggest that—that the committee was concerned about that, that that be done."

Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2318, Mar 31, 1993, Tape 65, Side A (statement of Committee Counsel Holly Robinson). The majority cites Robinson's use of the words "doing those things" as some support for its reading of the statute. ___ Or App at ___ (slip op at 13-14). It is not. Assuming care or custody of a child is obviously a "thing" that someone can "do." Conceiving a child and becoming a parent is also a "thing" that someone can "do," resulting in a legal duty to the child. That does not mean that anything a person does that results in their being legally or factually responsible for a child is a conduct element for criminal mistreatment. Robinson's reference to "doing those things" does not support the majority's position, especially when her entire point is that having assumed care, custody, or supervision is a characteristic of the actor, not the act.

I would therefore hold that the caregiver element is a circumstance element to which a culpable mental state of criminal negligence attaches.

Further, even if I agreed that there are two conduct elements, which I do not, the majority's approach in application collapses the two elements. The majority reads the statute as creating two separate conduct elements—(1) a past act of assuming care, and (2) a current act of withholding necessary care, deserting, or leaving unattended[5]—but then reasons that defendant could be found to have assumed care *by deciding to desert the child and leave him unattended*. ___ Or App at ___ (slip op at 3-4, 10). In other words, simply by forming the requisite *mens rea* for the prohibited acts (abandoning and leaving unattended without necessary provisions), a jury could find that defendant knowingly assumed care. That does not make sense. It disregards the temporal distinction between the two elements and effectively collapses them. It also would seem to make the instructional error on the caregiver element harmless, even if "knowingly" applies, because the jury found that defendant knowingly abandoned L and left him unattended in an unsafe place. Finally, I disagree that where defendant decided to leave L is relevant to whether he had assumed care—that is relevant only to whether he withheld care, ORS 163.205(1)(a), "[d]esert[ed]" the child "with the intent to abandon" him, ORS 163.205 (1)(b)(B), and left the child "unattended at a place for such a period of time as may be likely to endanger [his] health or welfare," ORS 163.205(1)(b)(C). It is not relevant to whether he had assumed care before doing those things.

In sum, although I agree with the majority that the trial court erred in giving jury instructions that did not require any culpable mental state for the caregiver element of first-degree criminal mistreatment, we part ways on what instruction should have been given. The majority holds that a

---

[5] As previously described, defendant was charged with violating three subsection of ORS 163.205(1). Paragraph (1)(a) prohibits "intentionally or knowingly withhold[ing] necessary and adequate food, physical care or medical attention from that other person." Subparagraph (1)(b)(B) prohibits "[d]esert[ing] the dependent person or elderly person in a place with the intent to abandon that person." Subparagraph (1)(b)(C) prohibits "[l]eav[ing] the dependent person or elderly person unattended at a place for such a period of time as may be likely to endanger the health or welfare of that person."

knowledge instruction should have been given. I would hold that a criminal negligence instruction should have been given.

That also leads me to disagree on the disposition of the criminal mistreatment convictions. We cannot reverse convictions based on instructional error that was harmless, *i.e.*, that had "'little likelihood'" of affecting the verdict. *State v. Owen*, 369 Or 288, 323, 505 P3d 953 (2022) (quoting *State v. Davis*, 336 Or 19, 33, 77 P3d 1111 (2003)). On this record, and given the jury's other findings, any rational juror would find that defendant assumed custody or care of the baby, L, with a *criminally negligent* mental state. When defendant stole the van (as the jury found he did), its engine was running, and its owner was mere feet away and tried to stop him. Defendant did not commit the conduct element of criminal mistreatment until later, when he realized that L was in the van and knowingly failed to provide necessary care to L, knowingly abandoned L, and knowingly left L unattended in an unsafe place. However, he *assumed custody and care* of L when he stole the van with L in it, and any rational juror would find that he was at least *criminally negligent* in doing so. I would therefore affirm the criminal mistreatment convictions based on the instructional error being harmless.[6]

I respectfully dissent.

---

[6] I have written separately to address the criminal mistreatment counts, but I must necessarily take a position on the other assignments of error as well. I fully agree with the majority's analysis of the venue issues. As for the kidnapping count, I agree with the disposition. Defendant was charged with kidnapping L by taking him "from one place to another." ORS 163.225(1)(a). The Supreme Court recently clarified the conduct element for that form of kidnapping in *State v. Anderson*, 374 Or 326, 577 P3d 746 (2025). It explained that "the movement generally must have served to limit the victim's freedom of movement and increase the victim's isolation." *Id.* at 341 (internal quotation marks omitted). Thus, the defendant forcibly moving his wife from inside their home to outside their home and locking her out was legally insufficient to prove kidnapping, as it "did not serve to increase [her] isolation or restrict her freedom of movement." *Id.* In this case, the majority treats L's starting "place" as the place where defendant first noticed L (alone with a car thief in a van being driven down the highway), rather than the place where L was when the incident began (in his father's car under his father's supervision). Under that view of the starting place, defendant did not take L "'from one place to another' as that phrase is used in the second-degree kidnapping statute," *id.* at 342, because L's ending place was *less* restrictive than his starting place. But defendant did not move for a judgment of acquittal based on the conduct element. He moved only as to the *intent* element, and his specific argument is under the "incidental" case law. That argument is unpersuasive, so I join in the disposition of the kidnapping conviction.