No. 262    March 26, 2025    267

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

PHILIP JOSEPH RODRIGUEZ,
*Defendant-Appellant.*

Grant County Circuit Court
19CR22959; A178690

Lung S. Hung, Judge.

Submitted January 22, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Rond Chananudech, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Peenesh Shah, Assistant Attorney General, filed the brief for respondent.

Before Powers, Presiding Judge, Hellman, Judge, and Armstrong, Senior Judge.

HELLMAN, J.

Reversed and remanded.

**HELLMAN, J.**

Defendant appeals a judgment of conviction for sex offenses committed against his daughter, E. On appeal, he raises three assignments of error. In his third assignment of error, defendant argues that the trial court erred in denying his motion to suppress statements obtained in violation of Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution. We conclude that defendant was subject to custodial interrogation and unequivocally invoked his right to counsel when he stated that he "need[ed] a lawyer." We further conclude that a law enforcement officer thereafter impermissibly initiated contact with defendant about defendant's unequivocal invocation, and that it was that impermissible interaction that led to the inculpatory evidence that was introduced at trial. As a result, the state did not meet its burden to demonstrate that defendant voluntarily waived his rights, and his statements were obtained in violation of Article I, section 12. Additionally, the error was not harmless. We reverse and remand. Our decision under Article I, section 12, eliminates the need for us to address defendant's arguments under the Fifth Amendment and his first and second assignments of error.

## I. FACTS AND PROCEDURAL HISTORY

In 2018, Minnesota Child Protective Services (CPS) began an investigation into defendant based on allegations of child abuse against his child, E. Minnesota CPS found that there were no concerns of physical or sexual abuse to E at that time. In January 2019, defendant took full custody of E and brought her back to John Day, Oregon. Later that year, E, who was approximately six years old, told her grandmother: "Daddy touches my privates with his privates." This statement sparked an Oregon Department of Human Services (DHS) investigation. In that investigation, E reported to law enforcement that defendant touched her "privates." E's medical examination was consistent with her statements to DHS. Based on that investigation, defendant was indicted for first degree rape (ORS 163.375), first degree sexual abuse (ORS 163.427), first degree sexual penetration

(ORS 163.411), first degree sodomy (ORS 163.405), and incest (ORS 163.525).[1]

Prior to trial, defendant filed a motion to suppress statements he made to John Day Chief of Police Michael Durr during a custodial interrogation, arguing that they were obtained in violation of Article I, section 12, and the Fifth Amendment.

At the suppression hearing, the trial court heard from Durr, Sergeant Scott Moore, and Officer Andrew Martin. The trial court also admitted body camera videos of defendant's arrest and his interactions with law enforcement at the jail.

A.   *Defendant's Arrest and Interrogations*

Defendant was arrested at his home. Durr, Moore, and Martin were present. Moore read defendant his *Miranda* rights. Durr introduced himself to defendant and had a short discussion with defendant about locking up defendant's home while he was in custody. Moore and Martin transported defendant to the Grant County Jail.

Once at the jail, defendant was brought to the booking room. Moore told defendant he would "like to talk to [him] about what's going on." Moore confirmed with defendant that he had been read his *Miranda* rights and again asked defendant if he understood his *Miranda* rights, which defendant confirmed. Defendant was then taken to the interview room at the jail.

Moore and Martin proceeded to interview defendant, telling him he was being charged with sex abuse. Approximately 15 to 20 minutes into the interview defendant invoked his right to counsel, stating, "guys, I mean, I guess at this point, I guess I need an attorney." Moore and Martin immediately responded: "I can understand that" and "yeah, absolutely." Both men stopped talking to defendant, stood up, and left the room. Defendant was subsequently moved back to the booking room.

---

[1] Defendant was also indicted for sexual penetration, but the trial court dismissed that count midtrial on the state's motion.

Moore and Martin told Durr that defendant did not want to talk and wanted an attorney. After hearing that, Durr was "under the impression" that defendant had "certainly" exercised his right to either remain silent or to an attorney.

Durr told Moore that he was going to go to the booking room "to introduce himself to" defendant.[2] His "intention was to just kind of explain the charges to him." Durr also wanted to "clarify whether [defendant] just you know, didn't want to talk to [Sergeant Moore] or, you know what his intentions were." Durr explained that this wasn't necessarily a "tactic" that he was "trained on," but that he knew that "sometimes people will get upset with the investigating officer, and somebody else goes back and they will want to talk to them." Durr knew there was "a possibility that [defendant] would talk to me."

Although Durr "recognized that it would have been best practice," he did not have his body camera on during the beginning of his interaction with defendant. Durr recalled that defendant "immediately" replied that he would speak with Durr but was not happy with how his initial meeting with Moore and Martin went.

After Durr moved defendant back to the interview room, he recorded himself summarizing the prior, unrecorded, conversation to defendant, and defendant's responses. As Durr stated:

"I know I was there when Scott [Moore] read you your *Miranda* warnings, and my understanding was, is they told me that, that you wanted an attorney, and you didn't want to talk. When I came back and I introduced myself to you and I – that's what I said, and what was your response?

"[DEFENDANT]:   No, I'm happy to talk with you guys.

"CHIEF DURR:   Okay.

"[DEFENDANT]:   And I'd like to get this cleared up, and I think it's just a huge misunderstanding.

"CHIEF DURR:   Okay. So you want to talk to me?

---

[2] Durr had previously introduced himself to defendant at the time of defendant's arrest.

"[DEFENDANT]:   Yes.

"CHIEF DURR:   Do you want your attorney present?

 "[DEFENDANT]:   Not right now. I don't think I need it."

Although Durr confirmed with defendant that defendant could terminate the interview at any time, Durr did not re-*Mirandize* defendant before talking to him.

During Durr's interrogation of defendant, defendant discussed the allegations made against him, first reiterating the contents of the initial interview with Moore and Martin and then explaining to Durr that E's mother's family "had brought some allegations forward" that spurred a child welfare investigation which, according to Durr's recounting, defendant stated was "put under the rug."

After those two interviews, Moore obtained defendant's consent for a DNA swab. Some of E's soiled clothes were seized pursuant to a warrant, and sperm collected from E's underwear ultimately resulted in a match with defendant's DNA profile.

The trial court denied defendant's motion to suppress, ruling:

"The initial discussion was voluntary up until the officer became more confrontive and he said he needed an attorney (Ex 3). The officers stopped their questions under the law cited by counsel in their memorandum. The statements to this point were voluntary.

"Thereafter, based on Exhibit 4 and Chief Durr's testimony, I find that it was [defendant] who reinitiated the conversation surrounding the investigation with the officers. However, this is a close legal analysis. Chief Durr did present himself and make himself available to [defendant]. He did so candidly in the belief that [defendant] might initiate a conversation about the investigation. He crafted his contact to advise [defendant] of his charges and did affirm [Durr] understood that [defendant] had requested an attorney and did not want to talk. Those statements do not 'initiate' a conversation about the facts of the case. In themselves they don't require an answer. [Defendant] did say he in fact did want to talk and Chief Durr was adequate and careful in reminding [defendant] of his right not to talk and his right

to have his attorney. [Defendant] knowingly and voluntarily waived those rights and spoke to Chief Durr. Under *State v. Fink*, 285 Or App 302[, 395 P3d 934] (2017) interpreting the Oregon and Federal Constitutions, his statements were knowingly and voluntarily and intelligently made."

Among other evidence at trial, the state relied on the DNA results and on defendant's statements to Durr. In closing argument, the prosecutor highlighted an inconsistency between defendant's statements to Durr and other witness testimony. The jury acquitted defendant of sodomy but convicted him of the remaining charges. This appeal followed.

## II.  ANALYSIS

"We review the denial of a motion to suppress for legal error." *State v. Fink*, 285 Or App 302, 308, 395 P3d 934 (2017). We defer to findings of fact that are "supported by constitutionally sufficient evidence in the record." *Id*.

## A.  *The Constitutional Protections Against Self-Incrimination*

Both Article I, section 12, and the Fifth Amendment protect against compelled self-incrimination.[3] *State v. Avilla-Nava*, 356 Or 600, 341 P3d 714 (2014); *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). As we have recognized, there is significant overlap in the analysis under both federal and state constitutions. As a result, we consider United States Supreme Court cases analyzing the Fifth Amendment as persuasive authority for our Article I, section 12, analysis. *Fink*, 285 Or App at 308-09 (relying on *Miranda* for an analysis under Article 1, section 12). We evaluate defendant's Article I, section 12, argument first, and because we find it dispositive in defendant's favor, we do not reach the Fifth Amendment analysis. *See State v. Dean*, 309 Or App 249, 266 n 5, 481 P3d 322 (2021) (considering state constitutional questions before federal constitutional questions as confirmed in *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983), concluding that the Article 1, section 12, issue was dispositive, and not reaching similar Fifth Amendment arguments from the defendant).

---

[3] Article I, section 12, provides that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself." The Fifth Amendment provides that "[n]o person *** shall be compelled in any criminal case to be a witness against himself."

        The right to the presence of counsel at interrogation derives from the right against self-incrimination protected by Article I, section 12. *Dean*, 309 Or App at 256. The right attaches when a person is in custody or a compelling setting and subject to interrogation. *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006) (describing when Article 1, section 12, protections attach). "Interrogation" means words or conduct that is reasonably likely to elicit an incriminating response on the part of the suspect. *State v. Hudson*, 253 Or App 327, 345, 290 P3d 868 (2012), *rev den*, 353 Or 562 (2013). An "incriminating response" is "any inculpatory or exculpatory response that the prosecution later may seek to introduce at trial." *Id.*

        Once a suspect unequivocally[4] invokes the right to counsel under Article I, section 12, interrogation must "immediately cease" until counsel is present. *State v. Boyd*, 360 Or 302, 318, 380 P3d 941 (2016); *State v. Tellez-Suarez*, 312 Or App 531, 536, 493 P3d 28, *rev den*, 368 Or 788 (2021); *see also Edwards v. Arizona*, 451 US 477, 484-85, 101 S Ct 1880, 1885, 68 L Ed 2d 378 (1981) (holding that a suspect "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him[.]").

        The parties agree that defendant was subject to custodial interrogation and unequivocally invoked his Article I, section 12, right to counsel when he stated, "guys, I mean, I guess at this point, I guess I need an attorney." The parties also agree that defendant eventually made inculpatory responses to Durr's interrogation. The disagreement is over whether defendant validly waived his Article I, section 12, rights before he made his statements to Durr.

B.  *Defendant did not make a knowing, voluntary, and intelligent waiver of his Article I, section 12, rights.*

        A defendant can waive a previously invoked right to counsel "as long as that waiver is knowing, intelligent, and voluntary under the totality of the circumstances." *State v. McAnulty*, 356 Or 432, 455, 338 P3d 653 (2014). There is a strong presumption against waiver of constitutional rights,

_____

    [4] The parties agree that this case involves an unequivocal invocation of rights.

and the "state bears the burden of showing that a defendant validly waived the right after invocation." *State v. Schrepfer*, 288 Or App 429, 437, 406 P3d 1098 (2017). To meet that burden, the state must establish "both that (1) the suspect initiated dialogue with the police in a way that evinced a willingness and a desire for a generalized discussion about the investigation and (2) there was a subsequent knowing and intelligent waiver of constitutional rights." *State v. Cavallaro*, 276 Or App 899, 905, 369 P3d 1220 (2016) (citation and internal quotation marks omitted); *see also Edwards*, 451 US at 486 n 9 (holding that for a waiver of the right to counsel to be valid, a "necessary fact [is] that the accused, not the police, reopened the dialogue with the authorities").[5]

  This case is missing the "necessary fact" of the defendant initiating contact with law enforcement.[6] A defendant "initiates" further contact with law enforcement, for purposes of a waiver analysis, when they make affirmative efforts to engage law enforcement on the matter for which they previously invoked a constitutional right. *See, e.g.*, *State v. Acremant*, 338 Or 302, 319, 108 P3d 1139 (2005) (finding a valid waiver in part because the defendant was the one who asked to speak to the detectives after being left alone for approximately one hour); *Fink*, 285 Or App at 313 (holding that the defendant waived her previously invoked right to an attorney when she "initiated the conversation with [the detective] in which she made the incriminating remarks"); *State v. Doyle*, 262 Or App 456, 470, 324 P3d 598 (2014) (the defendant initiated further conversation with detectives "after an extended break, asking, 'Can we talk?'").

---

[5] *Schrepfer* also recognized another possible way that the state can establish that a defendant waived a previously invoked right to remain silent: if law enforcement officers wait for an extended period of time, provide *Miranda* warnings again upon re-engaging the suspect, and the suspect "indicate[s] a willingness to talk about the investigation." 288 Or App at 437. Because this case deals with a defendant who invoked his right to counsel, that pathway is unavailable to the state here. *See State v. Holcomb*, 213 Or App 168, 174, 159 P3d 1271, *rev den*, 343 Or 224, 168 P3d 1155 (2007) (holding that "[t]he opportunity to resume interrogating the suspect varies depending on which right the suspect unequivocally invokes" and that when the suspect unequivocally invokes the right to counsel, the police are not permitted to attempt to resume the interrogation without the presence of counsel). We thus find the state's reliance on *State v. Bush*, 291 Or App 407, 415, 421 P3d 403 (2018), a case involving the right to silence, unpersuasive.

[6] Our case law has not been consistent as to whether the proper language is "initiate" or "re-initiate", but there is no material difference for purposes of our analysis.

Here, defendant made no affirmative effort to engage law enforcement on any matter. After he invoked his right to counsel, defendant did not again "initiat[e] further contact with the police." *Acremant*, 338 Or at 322. Instead, less than 15 minutes after defendant unequivocally invoked his right to counsel, Durr entered the booking room and engaged defendant about defendant's invocation of his constitutional right.[7] Because the record reflects that it was not defendant who "reopened the dialogue with the authorities," *Edwards*, 451 US at 486 n 9, the trial court's finding that defendant re-initiated contact is unsupported by the record and we do not defer to it.

In addition, defendant's initial invocation was unequivocal, which means there was no confusion about what occurred.[8] As a result, Durr's "clarifying" questions were unnecessary and impermissible. *See Tellez-Suarez*, 312 Or App at 535-36 ("If the invocation is unequivocal, there is but a single lawful response: interrogation must immediately cease."). Apart from the fact that clarifying questions are logically unnecessary for an unequivocal statement, there is a serious risk that the questions will undermine a person's absolute constitutional right to request counsel, and to be protected against further interrogation unless and until counsel is present. Once a person unequivocally invokes that constitutional right, it is not permissible for law enforcement to push back on that invocation to see if it will hold. *State v. Montez*, 309 Or 564, 572, 789 P2d 1352 (1990) ("The *Edwards* rule is prophylactic; it is designated to protect a suspect in custody from being 'badgered' by the police." (Citing *Oregon v. Bradshaw*, 462 US 1043, 1044, 103 S Ct 2830 (1983))).

As explained above, to establish a voluntary waiver the state was required to demonstrate *both* a "suspect initiated dialog" with law enforcement for a "generalized discussion about the investigation" *and* a knowing, voluntary, and

---

[7] Although talking to a suspect about routine booking matters after an unequivocal invocation can be permissible, *Fink*, 285 Or App at 307, that is not what Durr did.

[8] Indeed, the conduct of the first two officers supports this conclusion. When defendant said, "guys, I mean, I guess at this point, I guess I need an attorney," they immediately ceased their interrogation, stood up, and left the room.

intelligent waiver of the previously invoked constitutional right. *Cavallaro*, 276 Or App at 905 (internal quotation marks omitted). Because there was no "suspect initiated dialogue" here, we do not need to further evaluate whether defendant's waiver was knowing, voluntary, and intelligent. *Id.*

In the state's view, what Durr did was permissible because it was an "intent to elicit a waiver" rather than an intent to "elicit incriminating information." That argument does not aid the state's position. Law enforcement officers are forbidden from taking any steps to "elicit a waiver" of a suspect's invocation of the right to counsel. A permissible waiver of the right to counsel may occur only when *the suspect themselves* initiates further "dialogue with the authorities" about the invocation of a constitutional right or the criminal investigation. *Edwards*, 451 US at 486 n 9. And as we have explained above, there was no reason for Durr to seek clarification on an unambiguous invocation of the right to counsel.

The reasons Durr gave for initiating contact with defendant do not comport with law enforcement obligations after an unequivocal assertion of the right to counsel and we reject the state's characterization of this interaction as "scrupulously honor[ing] defendant's rights." Durr wanted to "introduce himself" and "explain the charges to" defendant, but he had already introduced himself at defendant's arrest, and Moore had already explained to defendant why he was arrested. Durr also wanted to "clarify" whether defendant just did not want to talk to one specific officer, Moore, and thought that defendant may talk to him about the investigation because some suspects will talk if a different officer presents themselves. But the constitutional right to counsel is not officer specific. And an unequivocal invocation of the right to counsel by its nature provides the answer to Durr's question: defendant does not want to talk to law enforcement officers— whoever they may be—without the presence of counsel.

It does not matter that Durr did not believe what he did was a "tactic" and that he had "no intention of interviewing" defendant. Durr knew from his own deputies that defendant had invoked the right to counsel; indeed,

defendant had made such an unequivocal invocation that the deputies immediately ceased questioning him and left the room. Durr's choice to thereafter re-engage with defendant about defendant's waiver violated Article I, section 12.

C.   *The error was not harmless.*

Even when there is a constitutional violation, we cannot reverse if the error is harmless. An error is harmless when there is "little likelihood that the error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P.3d 1111 (2003). When we determine the likely effect of the error, we consider "the possible influence that those statements had on the verdict and not whether proof of defendant's guilt was compelling even without the statements." *State v. Sanelle*, 287 Or App 611, 630, 404 P3d 992 (2017), *rev den*, 362 Or 482 (2018).

Although defendant consented to a DNA swab after Durr's further interrogation and without the presence of counsel, and that DNA evidence was evidence against defendant at trial, defendant did not separately assign error to the trial court's ruling that that the DNA evidence would have been inevitably discovered with a search warrant. As a result, we consider only defendant's statements in our harmless error analysis. Here, the state used defendant's statements to Durr to undermine defendant's credibility and his defense theory. Moreover, the prosecutor relied on those statements in closing argument, which further supports a conclusion that the error was not harmless. *See State v. Bowman*, 373 Or 213, 236-37 (2025) ("[T]he prosecution's explicit reliance on that hearsay assertion in closing argument, persuades us that the prosecutor * * * believed the evidence was important to proving the case."). On this record, the error was not harmless.[9]

In sum, defendant unequivocally invoked his Article I, section 12, right to counsel. Because Durr re-initiated contact with defendant about defendant's invocation of his right to counsel after that unequivocal waiver, the

---

[9] The state does not address harmlessness under either the Oregon or the federal standard. *See State v. Osborn*, 315 Or App 102, 500 P3d 61 (2021) (recognizing that when there is a federal constitutional violation "the state bears the burden to demonstrate that the error is harmless beyond a reasonable doubt."); *accord Chapman v. California*, 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967).

state has not met its burden to demonstrate that defendant made a constitutionally sufficient waiver of his Article I, section 12, rights. Defendant's statements to Durr were thus obtained in violation of Article I, section 12. The trial court erred in denying defendant's motion to suppress, and the error was not harmless.

Reversed and remanded.