No. 1135 December 31, 2025 149

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRANDON MATTHEW NAGY,
*Defendant-Appellant.*

Washington County Circuit Court
19CR43652; A178921

Erik M. Bucher, Judge.

Argued and submitted July 16, 2024.

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Conviction on Count 1 reversed and remanded; conviction on Count 6 reversed and remanded with instructions to enter a finding of guilt on fourth-degree assault; remanded for resentencing; otherwise affirmed.

**ORTEGA, P. J.**

A jury found defendant guilty of first-degree assault (Count 1), ORS 163.185, three counts of first-degree criminal mistreatment (Counts 2, 4, and 6), ORS 163.205, and three counts of third-degree assault (Counts 3, 5, and 7), ORS 163.165(1)(h), for injuring his girlfriend's six-month-old child, C, over the course of several days. On appeal from the resulting judgment of conviction, he raises 10 assignments of error. In his first seven assignments, defendant contends that the trial court plainly erred in failing to instruct the jury on the culpable mental state for the resulting "physical injury" or "serious physical injury" element on each count. In his eighth assignment, defendant argues that the trial court erred in denying his motion to suppress his statements to police after he received *Miranda* warnings. In his ninth assignment, defendant contends that the trial court erred in preventing him from cross-examining C's mother, Johnson, about an assault she allegedly directed against defendant, for the purpose of establishing her bias. Finally, defendant challenges the denial of his motion for judgment of acquittal (MJOA) on Count 6 because, in his view, the state failed to adduce sufficient evidence that he had knowingly "assumed the permanent or temporary care, custody or responsibility for the supervision of" C when he caused the physical injury alleged in that count.

Addressing his MJOA first, we conclude that the state adduced insufficient evidence for a rational factfinder to find that defendant knowingly assumed the care, custody, or responsibility for the supervision of C when he caused the physical injury alleged in Count 6. We next conclude that the trial court did not err in denying defendant's motion to suppress because defendant initiated the conversation about this case with police and validly waived his *Miranda* rights. We reject defendant's contention that the trial court committed reversible error in limiting his cross-examination of Johnson, because the court allowed defendant to make an initial showing of Johnson's bias and her involvement in the assault. Finally, as to defendant's challenges to the failure to instruct the jury on the culpable mental state for the resulting injuries, we accept the state's concession that the

court erred and conclude that the errors were harmless as to all counts but Count 1.

Accordingly, we reverse defendant's conviction on Count 6 with instructions to enter a finding of guilt on the lesser-included offense of fourth-degree assault. We also reverse his conviction on Count 1, remand for a new trial on that count and for resentencing, and otherwise affirm.

To contextualize the parties' arguments, we provide a brief overview of the historical facts and recite in our analysis additional facts relevant to each assignment of error. At the time of the charged incidents, defendant and Johnson had been in an intimate relationship for a few months, and they used methamphetamine and heroin together several times per day. Johnson had a six-month-old son, C, and between January 30 and February 10, 2017, C—who was not independently mobile—suffered severe bruising around his eyes and forehead (Counts 6 and 7); a broken jaw and severe bruising on his earlobe and scalp (Counts 4 and 5); severely swollen testicles and severe bruising around his perineum and anus (Counts 2 and 3); and a seizure caused by a subdural hematoma (Count 1). The state's theory was that defendant intentionally inflicted those injuries when he was alone with C on four separate occasions. Defendant's theory was that Johnson inflicted C's injuries. A jury found defendant guilty of all seven counts.

## SUFFICIENCY OF EVIDENCE ON COUNT 6: FIRST-DEGREE CRIMINAL MISTREATMENT

We address defendant's tenth assignment of error first because it provides more complete relief on Count 6 than his other assignments of error. *State v. Paul*, 345 Or App 348, 351, ___ P3d ___ (2025). Defendant contends that the trial court should have granted his MJOA on that count of first-degree criminal mistreatment because, in his view, the state failed to adduce sufficient evidence that he had knowingly "assumed the permanent or temporary care, custody or responsibility for the supervision of" C when he caused the physical injuries alleged in that count (severe bruising around C's eyes and forehead).

As relevant to Count 6, ORS 163.205(1)(b)(A) provides that a person commits first-degree criminal mistreatment if:

"(b)   The person, * * * *having assumed the permanent or temporary care, custody or responsibility for the supervision of a dependent person* or elderly person, intentionally or knowingly:

"(A)   Causes physical injury or injuries to the dependent person or elderly person[.]"

(Emphasis added.)

We review the denial of an MJOA for legal error, viewing the evidence, as well as reasonable inferences and credibility choices, in the light most favorable to the state to determine whether a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *State v. Stevens*, 343 Or App 321, 322, 577 P3d 1172 (2025).

In accordance with that standard, the record contains the following evidence concerning the assumption-of-care element as to Count 6. On February 1, 2017, Johnson noticed that C's eyes started to blacken with dark purple bruising that spanned around the side of his head to the bottom of his face. At trial, Johnson attributed that bruising to an incident that had occurred a day or two before when defendant spent the night at her apartment. According to Johnson, she and defendant were lying in bed late at night after doing drugs. C was asleep in his crib in the bedroom, and Johnson's mother was sleeping in the other bedroom. Johnson got up and went outside to smoke a cigarette, leaving the back door open. When she left the room, defendant's eyes were closed, and she thought he was asleep. A few minutes later, Johnson heard a loud "cracking" sound, so she rushed back into the bedroom. C was screaming like he was in pain, and there was a hard plastic crawl-ball in his crib that had not been there before. Defendant was sitting on or standing next to the bed and denied doing anything to upset C.

At trial, defendant moved for judgment of acquittal on Count 6, arguing that the state failed to prove that he "knowingly" assumed the permanent or temporary care, custody, or responsibility for the supervision of C when

Johnson went outside to smoke. The court denied the motion on the grounds that the state had presented evidence from which the jury could infer that defendant was aware that he was taking care of C.

On appeal, defendant renews his argument that there is insufficient evidence as a matter of law that he knowingly assumed the temporary care, custody, or responsibility of C when he caused the bruising on C's eyes and head. Defendant contends that there is no evidence that he had ever provided care for C before this incident or that he had done so during the time when Johnson went outside to smoke. The state responds that a reasonable factfinder could infer that defendant had woken up and was alone with C and that defendant assumed temporary care and responsibility for supervising C whenever he was alone with C.

We recently construed the assumption-of-care element in ORS 163.205 in *Paul*. In that case, the defendant stole a van that was left running and unattended and, at some point while driving, noticed that there was a nine-month-old baby in the backseat. 345 Or App at 350. The defendant took the baby out of his car seat and left him on the side of the road, where he was found unharmed later that morning. *Id.*

On appeal, the defendant challenged the denial of his MJOA for first-degree criminal mistreatment, arguing that there was no evidence to prove that he assumed care of the baby with any culpable mental state. *Id.* at 351. In construing ORS 163.205, we relied on the plain meaning of "assume" ("to take upon oneself (to do or perform) : UNDER-TAKE") to conclude that "assuming care is conduct involving a physical act of the defendant." *Id.* at 357. Accordingly, we held that "the assumption of care is a conduct element, and a default culpable mental state of knowledge applies." *Id.* at 357-58. We explained that "[a] person who owes no legal duty to a baby is not presumed to have any responsibility for the baby absent some physical manifestation of assumption of care," meaning that "the adult engages in some conduct by which they take temporary care of the child." *Id.*

Applying that understanding of the assumption-of-care element to the facts in *Paul*, we held that there was

sufficient evidence to permit a jury to find that the defendant knowingly assumed care of the baby that he subsequently deserted. *Id.* at 352. We reasoned that "[a] jury could find that, after [the] defendant became aware of [the baby]'s presence, he knowingly assumed care of the infant at least by the time he made the conscious decision to leave him in a dangerous and secluded area, if not earlier when he continued to drive with an awareness that [the baby] was in the backseat." *Id.* We pointed to evidence of the defendant's affirmative acts after he was aware of the baby's presence from which the jury could find that he physically manifested the assumption of care, including continuing to drive with the baby in the backseat and removing the baby from the car to abandon him. *Id.*

We reach a different conclusion in this case. Here, we agree with defendant that there is no evidence that he engaged in an affirmative act by which he took temporary care or responsibility for the supervision of C when Johnson went outside to smoke. There is no evidence that defendant had cared for C or agreed to care for C on or before that night. And *Paul* forecloses the state's argument that the jury could reasonably infer that defendant assumed temporary care and responsibility for supervising C whenever he was alone with C. Our construction of the assumption-of-care element in ORS 163.205 requires *the defendant* to engage in some affirmative act that manifests the assumption of care; another person's affirmative act—such as Johnson's leaving C alone with defendant—is insufficient to establish that element without more. Finally, although the jury could reasonably infer that defendant woke up and injured C with the crawl ball after Johnson left to smoke, neither of those affirmative acts supports a finding that defendant undertook the temporary care or responsibility for the supervision of C while Johnson was out of the room.[1] We therefore conclude that the trial court erred when it denied defendant's MJOA on Count 6.

---

[1] Indeed, *Paul* strongly suggests that because there are two actions subsumed in the conduct element in ORS 163.205—one that creates the legal duty to the victim and one that causes harm to the victim—the act of causing harm cannot itself be the same act that manifests the assumption of care, even if there is overlapping evidence to support each element. *See* 345 Or App at 357 ("As set out in the statute ***, the conduct of criminal mistreatment involves two actions on the part of the criminal actor—assuming care *and* failing to provide care in some way." (Emphasis in original.)).

Because defendant does not challenge the sufficiency of the evidence that he caused the physical injury to C underlying Count 6, we reverse defendant's conviction on that count with instructions to enter a finding of guilt for fourth-degree assault. *See State v. Rodvelt*, 187 Or App 128, 130, 66 P3d 577, *rev den*, 336 Or 17 (2003) (accepting the state's concession that "all of the elements of fourth-degree assault are necessarily included in the type of criminal mistreatment with which [the] defendant was charged").[2]

## MOTION TO SUPPRESS

In his eighth assignment, defendant argues that the trial court erred in denying his motion to suppress his statements to police after he received *Miranda* warnings. We conclude that the trial court did not err because defendant initiated the discussion about this case with police and validly waived his *Miranda* rights.

We review the denial of a motion to suppress for legal error. *State v. Rodriguez*, 339 Or App 267, 272, 568 P3d 202 (2025). In doing so, we defer to findings of fact that are supported by constitutionally sufficient evidence in the record. *Id.* We state the evidence presented at the suppression hearing in accordance with that standard.

On February 10, 2017, C was transported to the hospital after defendant and Johnson called 9-1-1. On February 13, defendant went to the Hillsboro Police Department and spoke to Detectives Kamenir and Buell about C's injuries. At the beginning of the interview, Kamenir told defendant he was free to leave and read defendant his *Miranda* rights, and defendant said he understood his rights. The interview ended when defendant invoked his right to have counsel present for interrogation.

On February 18, defendant reported to police that he had been the victim of an assault the day before. During that investigation, police learned that defendant had an outstanding probation violation warrant and arrested him

---

[2] The jury also found defendant guilty of third-degree assault (Count 7) for causing the bruising to C's eyes and head, which required the jury to find that defendant was at least 18 years old and caused physical injury to a child aged 10 or younger, ORS 163.165(1)(h). On remand, the finding of guilt for fourth-degree assault in Count 6 will likely merge with the finding of guilt on Count 7.

on that warrant. While defendant was in custody at the Hillsboro Police Department, Kamenir advised him of his *Miranda* rights and began interviewing him about the assault. Several minutes into the interview, as defendant described someone hitting him, he referred to C's injuries and offered information about Johnson related to that investigation:

> "[DEFENDANT]:    B]ecause this is—this is her—this is the kid—little boy's dad (indiscernible) because of that—they think that I did that to this little boy. So—and I—I didn't—(indiscernible) nothing about it. ***** I didn't do it. (Indiscernible), but there's things I've—that I've wanted to tell you that [Johnson]—I've seen with [Johnson] that I (indiscernible).

> "DETECTIVE KAMENIR:    Okay. Well, you remember the last time you said you wanted a lawyer, and you didn't want to talk. That's been a few days, okay? So do you want to talk about it—that incident now or—

> "[DEFENDANT]:    I mean, I—I totally (indiscernible) whatever, you know.

> "DETECTIVE KAMENIR:    Okay. Well, I—

> "[DEFENDANT]:    I'm not—I'm not going to get beat up over—over this (indiscernible) thinks that I did something I didn't do.

> "DETECTIVE KAMENIR:    I want to be perfectly clear because last time you said you wanted a lawyer, so you're saying now you're willing to talk to me about it without a lawyer.

> "[DEFENDANT]:    Yeah, I wanted to talk to you, yes."

Defendant briefly told Kamenir about Johnson's drug use, and Kamenir interjected to again read defendant his *Miranda* rights, after which defendant said he understood. Defendant did not invoke his right to silence or right to counsel in the remainder of the interview.

Before trial, defendant moved to suppress his February 18 statements to police, arguing that they were obtained in violation of his *Miranda* rights under the state and federal constitutions. After hearing the foregoing evidence, the trial court denied the motion. The court agreed

with the state that Kamenir did not question defendant about C's injuries until defendant initiated the discussion on that topic, that Kamenir reread defendant his rights, and that defendant knowingly and voluntarily waived those rights.

Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution protect against compelled self-incrimination.[3] *State v. Boyd*, 360 Or 302, 380 P3d 941 (2016); *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). Given the significant overlap in the analysis under both the state and federal constitutions, we consider United States Supreme Court cases analyzing the Fifth Amendment as persuasive authority for our Article I, section 12, analysis. *Boyd*, 360 Or at 309 (noting that Article I, section 12, case law "has relied heavily on federal Fifth Amendment doctrine"). We evaluate defendant's Article I, section 12, argument first and do not separately address his argument under the Fifth Amendment because the applicable legal standard is the same under that provision.

"To protect a person's right against compelled self-incrimination under Article I, section 12, before interrogating a person in custody, police must provide the person with the same type of warnings that are required by the Fifth Amendment under *Miranda*[.]" *State v. Fink*, 285 Or App 302, 309, 395 P3d 934 (2017). Whether police questions constitute "interrogation" for Article I, section 12, purposes depends on "whether the nature of the police questioning was such that it was reasonably 'likely to elicit an incriminating response.'" *Boyd*, 360 Or at 316 (quoting *Rhode Island v. Innis*, 446 US 291, 100 S Ct 1682, 64 L Ed 2d 297 (1980)).

"[O]nce a suspect has invoked the rights to remain silent and to counsel under Article I, section 12, police must immediately cease interrogation[.]" *Id.* at 318. "However, after a suspect in custody has asserted the right to counsel, 'the suspect remains free to waive that right by initiating

---

[3] Article I, section 12, provides that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself." The Fifth Amendment provides that "[n]o person *** shall be compelled in any criminal case to be a witness against himself."

further contact with the police.'" *Fink*, 285 Or App at 312 (quoting *State v. Acremant*, 338 Or 302, 322, 108 P3d 1139, *cert den*, 546 US 864 (2005)). To establish that a suspect has waived a prior invocation of the right to counsel, "the state must show not only that the suspect initiated communication with the police in a way that 'evinced a willingness and a desire for a generalized discussion about the investigation' but also that the suspect's waiver was knowing and voluntary under the totality of the circumstances." *Id.* (quoting *State v. Meade*, 327 Or 335, 340-42, 963 P2d 656 (1998)); *see also Edwards v. Arizona*, 451 US 477, 486 n 9, 101 S Ct 1880, 68 L Ed 2d 378 (1981) (holding that for a waiver of the right to counsel to be valid, a "necessary fact [is] that the accused, not the police, reopened the dialogue with the authorities"). "A defendant 'initiates' further contact with law enforcement, for purposes of a waiver analysis, when they make affirmative efforts to engage law enforcement on the matter for which they previously invoked a constitutional right." *Rodriguez*, 339 Or App at 274 (collecting cases).

Here, the parties appear to agree that the trial court implicitly found that defendant was subjected to custodial interrogation about C's injuries at the February 13 interview and that he unequivocally invoked his right to counsel. There is also no dispute that defendant was in custody on February 18 when Kamenir interviewed him as the victim of an assault. The parties disagree about whether defendant initiated further communication with Kamenir about C's injuries. In defendant's view, he did not initiate the interrogation because "[h]e was arrested and delivered to Detective Kamenir for questioning about a potentially related investigation" such that the questions "were objectively likely to relate to the child abuse case and thus objectively likely to elicit an incriminating response." In the state's view, defendant's argument fails under the federal constitution because he was not in custody on February 13, so "the federal *Miranda* procedures were not triggered, defendant's invocation was not effective, and the federal constitution did not constrain the police's ability to seek a waiver in the future." The state further argues that the February 18 interview did not violate either the state or the federal constitution "because defendant was not interrogated during that interview until

after he reinitiated conversation about this case and waived his right to have counsel present for questioning."

We agree with the state's argument that defendant was not interrogated until after he initiated conversation with police about this case and validly waived his right to have counsel present. Here, defendant was in custody on a probation-violation warrant, and Kamenir interviewed defendant as the victim of an assault that had occurred the previous day. Kamenir read defendant his *Miranda* rights, and defendant acknowledged that he understood his rights. Kamenir asked defendant who assaulted him, and defendant described what happened and stated that "this is the kid—little boy's dad (indiscernible) because of that—they think that I did that to this little boy." Up to that point, Kamenir had not inquired about C, Johnson, or the events of February 10. And there is no evidence in the suppression record that police knew that the assault was related to C's injuries. Defendant then denied hurting C but offered that he had helpful information concerning Johnson about that case. On this record, we conclude that defendant "initiated further conversation that evinced a willingness and a desire for a generalized discussion about the investigation" of C's injuries. *Meade*, 327 Or at 341. We reach that legal conclusion despite the fact that Kamenir orchestrated the February 18 interview with defendant, because he did not initiate conversation with defendant about this case and did not interrogate defendant until after *defendant* initiated further conversation about C's injuries.

Defendant does not challenge the trial court's determination that he validly waived his right to have counsel present during the February 18 interview after Kamenir read defendant his *Miranda* rights the second time. We therefore conclude that the trial court did not err in denying defendant's motion to suppress.

## CROSS-EXAMINATION ON JOHNSON'S BIAS

We turn to defendant's ninth assignment of error in which he contends that the trial court erred when it prohibited him from cross-examining Johnson about an assault that she allegedly directed against him and the extent of his

injuries, for the purpose of establishing her bias. Specifically, defendant argues that the trial court erred in ruling that the fact that defendant was assaulted, and any description or depiction of his injuries, was irrelevant. The state responds that we should not reach the merits of this claim because, among other things, defendant failed to make an offer of proof of the excluded testimony. On the merits, the state argues that the trial court correctly allowed defendant to question Johnson about the assault and whether she was involved and properly precluded him from asking about how he looked after the assault. Finally, the state argues that any error would have been harmless because "the jury had a more-than-adequate opportunity to assess the claimed interest and evaluate Johnson's credibility," given that defendant was allowed to, and did, question Johnson about the assault and whether she was involved, Detective Kamenir had already testified that defendant was assaulted, and defendant argued in closing that Johnson took him to a hotel "to receive a beating."

We conclude that any error in preventing defendant from cross-examining Johnson about whether defendant was in fact assaulted and the extent of his injuries would not require reversal. "Evidential error is not presumed to be prejudicial." OEC 103(1).[4] "Article VII (Amended), section 3, [of the Oregon Constitution] requires an appellate court to affirm a conviction, notwithstanding any evidentiary error, if there is little likelihood that the error affected the verdict." *State v. Gibson*, 338 Or 560, 576, 113 P3d 423 (2005) (citing *State v. Davis*, 336 Or 19, 33, 77 P3d 1111 (2003)). "[A] decision to exclude evidence relevant to bias or interest[,] which is [in] error, is reversible if it denies the jury an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial." *State v. Hubbard*, 297 Or 789, 800, 688 P2d 1311 (1984).

Here, there is no question that Johnson's credibility was important to the outcome of the case—she was the

---

[4] We acknowledge that, "in a criminal case, the right to impeach a witness for bias or interest is secured to criminal defendants by the Oregon and United States constitutions as part of the right to confront witnesses." *State v. Nacoste*, 272 Or App 460, 467-68, 356 P3d 135 (2015). Defendant did not raise a constitutional objection below or on appeal.

only witness to place defendant alone with C during each of the charged incidents. But we agree with the state that the trial court's ruling precluding defendant from asking Johnson whether defendant was in fact assaulted and the extent of his injuries did not deny the jury an adequate opportunity to assess her credibility. Although Johnson initially denied being involved in a plot to assault defendant with C's putative biological father, Herschel, she confirmed on cross-examination that Herschel and his brother came to her apartment; that "it was discussed that maybe they wanted to do something [to] whoever was responsible"; that she "may have" agreed to bring defendant to a hotel; that she picked up defendant, drove him to a hotel to meet a friend, and saw that the Herschel brothers were also there; that she falsely told police that she was at the hotel because defendant had kidnapped her; but that she "wasn't aware that he was going to be attacked." Johnson thus implicitly confirmed that defendant was in fact assaulted and the extent of her involvement in the assault. Accordingly, the scope of defendant's cross-examination provided the jury an adequate opportunity to assess Johnson's credibility regarding her knowledge of and involvement in assaulting defendant. *Cf. State v. Nacoste*, 272 Or App 460, 470, 356 P3d 135 (2015) (concluding that the exclusion of "*all* evidence" of the witness's reasons for currying favor with the prosecution denied the jury an adequate opportunity to assess her credibility (emphasis in original)). We therefore reject defendant's ninth assignment of error.

## FAILURE TO INSTRUCT JURY ON CULPABLE MENTAL STATE FOR PHYSICAL INJURY ELEMENTS

Finally, we address defendant's first seven assignments, in which he contends that the trial court erred in failing to instruct the jury on the culpable mental state for the resulting "physical injury" or "serious physical injury" element on each count. At trial, defendant requested jury instructions that included a culpable mental state of criminal negligence for the result element on each count, and the court declined to give defendant's requested instructions. The state concedes error on appeal but argues that the error was harmless beyond a reasonable doubt as to all counts.

We accept the state's concession that the trial court erred in not giving defendant's requested instructions on each count. Shortly after the trial in this case, the Supreme Court decided *State v. Owen*, 369 Or 288, 321-22, 505 P3d 953 (2022), which held that the result element—physical injury—of second-degree assault carries, at a minimum, a culpable mental state of criminal negligence, and that a court errs in failing to instruct the jury accordingly. The holding in *Owen* applies equally to the result element of physical injury in first-degree criminal mistreatment and the result element of serious physical injury in first-degree assault. *State v. Allen*, 321 Or App 678, 685, 517 P3d 1055 (2022). And we see no reason it would not also apply to third-degree assault as charged in this case. *See* ORS 163.165(1)(h) ("A person commits the crime of assault in the third degree if the person *** [b]eing at least 18 years of age, intentionally or knowingly causes physical injury to a child 10 years of age or younger[.]").

Having concluded that the trial court erred, we must determine if that error requires reversal. Because the failure to submit a required element of an offense to the jury is a federal constitutional error, "[t]he test 'is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Perkins*, 325 Or App 624, 630-31, 529 P3d 999 (2023) (quoting *Neder v. United States*, 527 US 1, 15, 119 S Ct 1827, 144 L Ed 2d 35 (1999)). In determining whether instructional error was harmless, "we consider the instructions as a whole and in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue." *Owen*, 369 Or at 323 (internal quotation marks and citation omitted).

Here, defendant's theory was that Johnson inflicted C's injuries. The state's theory was that defendant knowingly engaged in assaultive conduct with sufficient force to cause the severe bruising around C's eyes and forehead (Counts 6 and 7); a broken jaw and severe bruising on his earlobe and scalp (Counts 4 and 5); severely swollen testicles and severe bruising around his perineum and anus (Counts 2 and 3); and a seizure caused by a subdural hematoma (Count 1).

There was no direct evidence of the nature of the conduct that caused C's injuries because defendant was alone with C each time, and C could not provide such direct evidence. A child abuse pediatrician testified that the nature of C's injuries suggested that they were recently and "violently inflicted," and not accidental or incidental, and he gave various examples of violent conduct that could cause them.

The trial court instructed the jury that it must find that defendant "knowingly" caused serious physical injury for Count 1 and "knowingly" caused physical injury for Counts 2 through 7, that "[a] person acts knowingly or with knowledge if that person acts with an awareness that his conduct is of a particular nature," and that

> "In order to prove that the defendant knowingly caused physical injury or serious physical injury to C[], the state must prove only the defendant was aware of the assault[ive] nature of his conduct. The state need not prove that the defendant was aware that his conduct would in fact cause physical injury or serious physical injury to C[]."

The court also provided the uniform instructions for "physical injury" and "serious physical injury."

We conclude that instructing the jury that defendant must have acted with criminal negligence that his conduct would cause physical injury for first-degree criminal mistreatment (Counts 2, 4, and 6) and third-degree assault (Counts 3, 5, and 7) would not have affected the verdict. A defendant acts with criminal negligence when they "fail[] to be aware of a substantial and unjustifiable risk that the result will occur" and "[t]he risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." ORS 161.085(10). Here, the jury found that defendant acted with an awareness of the assaultive nature of his conduct, and defendant did not assert a defense theory that he caused C's injuries by accident. In light of the medical testimony about the severity of C's injuries, that they were recent, and that they were "violently inflicted," it is beyond reasonable doubt that the jury would also have found that defendant was at least criminally negligent with respect to his assaultive conduct

causing C—a six-month-old, premobile infant—*some* physical injury, either substantial pain or impairment of physical condition. *Accord Allen*, 321 Or App at 686-87 (so concluding under similar facts).

However, we reach a different conclusion as to Count 1, first-degree assault. We conclude that there is reasonable doubt whether the failure to instruct the jury on criminal negligence regarding C's serious physical injury affected the verdict on that count. The jury's finding here that defendant was aware of the assaultive nature of his conduct does not necessarily imply that he failed to be aware of a substantial risk that his assaultive conduct would cause C *serious* physical injury, because there was no direct evidence of precisely what conduct caused C's subdural hematoma. *Accord Allen*, 321 Or App at 687-88 (so concluding under similar facts). Without such evidence, we cannot say beyond a reasonable doubt that the jury would have found that defendant was at least criminally negligent with respect to his unknown assaultive conduct causing C physical injury that creates a substantial risk of death, causes serious and protracted disfigurement, causes protracted impairment of health, or causes protracted loss or impairment of the function of bodily organs. We therefore reverse and remand Count 1 for new trial on this assignment.

Conviction on Count 1 reversed and remanded; conviction on Count 6 reversed and remanded with instructions to enter a finding of guilt on fourth-degree assault; remanded for resentencing; otherwise affirmed.